SYLLABUS

*This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.*

**Russell Forde Hornor v. Upper Freehold Regional Board of Education**
**(A-36-24) (089973)**
**Ormond Simpkins, Jr. v. South Orange-Maplewood School District**
**(A-37/38/39-24) (089974)**

**Argued September 26, 2025 -- Decided March 11, 2026**

**JUSTICE PATTERSON, writing for the Court.**

In these appeals from four matters in which the plaintiffs allege that New Jersey public school teachers sexually abused them when they were high school students, the Court considers whether N.J.S.A. 59:2-1.3(a)(1), a provision of the Child Victims Act enacted by the Legislature in 2019, authorizes the imposition of vicarious liability on a school district for a teacher's sexual abuse of a student outside the scope of the teacher's employment. One appeal raises a second issue: whether the Appellate Division properly reversed the trial court's denial of defendants' motion to dismiss plaintiff's claim for breach of fiduciary duty.

Plaintiff Russell Forde Hornor filed an action asserting in part that the Upper Freehold Regional Board of Education was vicariously liable for science teacher Charles Hutler's alleged sexual abuse of plaintiff at Hutler's home in 1979, when plaintiff was fifteen years old, and that the Board breached a fiduciary duty to him. The trial court denied the Board's motion to dismiss those claims. The Appellate Division reversed on appeal. The Court granted Hornor's motion for leave to appeal. 260 N.J. 82 (2025).

Plaintiffs' claims in the three cases brought against the South Orange-Maplewood School District -- consolidated as Simpkins -- arise from sexual abuse allegedly committed by English and special education teacher Nicole Dufault. The three plaintiffs allege that Dufault sexually assaulted them during and after school hours, including on school grounds. The trial court granted the District's motions to dismiss in all three cases. The Appellate Division consolidated the cases and affirmed. As in Hornor, the appellate court in Simpkins held that N.J.S.A. 59:2-1.3(a)(1) does not allow vicarious liability for the alleged conduct. The Court granted the motions for leave to appeal filed by each of the three plaintiffs. 260 N.J. 87 (2025); 260 N.J. 89 (2025); 260 N.J. 93 (2025). The Court consolidated the three appeals in Simpkins with the appeal in Hornor for purposes of its opinion.

1

**HELD:** N.J.S.A. 59:2-1.3(a)(1) does not categorically bar the imposition of vicarious liability on a public entity for acts of sexual abuse outside the scope of a teacher's employment, and plaintiffs' vicarious liability claims should not have been dismissed at the pleading stage. The Court adopts a standard for the determination of vicarious liability claims asserted against public schools pursuant to the statute. As to the second issue, a public school does not bear a fiduciary duty to a student.

1.  In Hardwicke v. American Boychoir School, the Court considered, in part, vicarious liability claims asserted against a private boarding school by a former student who alleged repeated sexual assault by the school's music director. 188 N.J. 69, 76, 79 (2006). The Court rejected the school's argument that it could not be held vicariously liable for the intentional acts of its employees. Id. at 100. The Court did not, however, prescribe a specific standard for claims premised on a nonprofit boarding school's vicarious liability for common-law claims arising from sexual abuse outside the scope of employment. See id. at 100-02. Instead, the Court reiterated the vicarious liability standard it had imposed in the employment settings of Lehmann v. Toys 'R' Us, 132 N.J. 587, 619-20 (1993) and Abbamont v. Piscataway Township Board of Education, 138 N.J. 405, 429-32 (1994). (pp. 22-28)

2.  When it enacted the Tort Claims Act (TCA) in 1972, the Legislature determined that "[e]xcept as otherwise provided by [the TCA], a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." N.J.S.A. 59:2-1(a). In N.J.S.A. 59:2-2(a), the Legislature prescribed an exception to its broad grant of immunity for vicarious liability for "an act or omission of a public employee within the scope of his employment." But the Legislature expressly immunized public entities from vicarious liability "for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2-10. Accordingly, prior to the enactment of the Child Victims Act in 2019, the TCA barred virtually all claims for public entity vicarious liability arising from public employees' sexual assaults of children. The Child Victims Act fundamentally altered the law governing civil claims against public entities and certain private entities arising from sexual abuse. In the provision at the center of these appeals, now codified at N.J.S.A. 59:2-1.3(a), the Legislature abrogated TCA immunities that would otherwise bar claims against certain public entities in "an action at law for damages as a result of a sexual assault . . . or sexual abuse . . . being committed against a person which was caused by a willful, wanton, or grossly negligent act of the public entity or public employee." (pp. 29-35)

3.  In the wake of the Child Victims Act, neither the TCA's broad general rule of immunity in N.J.S.A. 59:2-1(a), nor any TCA provisions that confer immunity in specific settings -- including, as relevant here, N.J.S.A. 59:2-10 -- apply to claims premised on sexual assault and other sexual misconduct as described in N.J.S.A.

2

59:2-1.3(a). That conclusion is underscored by N.J.S.A. 59:2-1.3(a)'s legislative history. By virtue of N.J.S.A. 59:2-1.3(a)(1), the Legislature has eliminated the immunities to which the public entities in these appeals would otherwise be entitled, and vicarious liability claims against a public entity for a public employee's sexual misconduct under N.J.S.A. 59:2-1.3(a)(1) are not categorically barred solely on the basis that the sexual misconduct alleged is beyond the scope of employment. The TCA does not immunize the defendant school districts in these appeals. (pp. 36-39)

4. The Court considers the standard a plaintiff must satisfy to establish the vicarious liability of a public school under N.J.S.A. 59:2-1.3(a) for a claim based on a teacher's sexual assault of, or sexual misconduct against, a student. The Legislature cited Hardwicke in statements about the Child Victims Act, suggesting that it envisioned a fact-specific analysis of school officials' acts and omissions as they relate to a school employee's sexual abuse of a student. Moreover, the Lehmann and Abbamont decisions on which Hardwicke relied stress the importance of incentivizing employers to implement and enforce meaningful policies against sexual harassment in the workplace. Accordingly, any standard imposed for claims asserted under N.J.S.A. 59:2-1.3(a)(1) should incentivize school officials to vigilantly guard against the sexual abuse of students through the implementation and enforcement of appropriate policies. The presence or absence of such policies should be a factor in the analysis. But the Lehmann standard cited in Hardwicke was designed for sexual harassment claims brought by employees in the workplace, not claims based on the sexual abuse of students in a public school, and so not all elements of that standard are relevant in the school context. (pp. 39-46)

5. The Court holds that in order for a plaintiff to prevail in a vicarious liability claim in an action at law for damages under N.J.S.A. 59:2-1.3(a)(1) against a public school arising from a school employee's sexual abuse of or sexual misconduct against a student caused by a willful, wanton, or grossly negligent act of the school employee, the factfinder must determine that:

> (1) The school gave the employee who allegedly committed sexual abuse or other sexual misconduct described in N.J.S.A. 59:2-1.3(a)(1) the authority to control the student's educational environment;

> (2) the school employee's exercise of that authority resulted in the sexual abuse or sexual misconduct; and

> (3) it reasonably appeared that the school employee's sexual abuse of or sexual misconduct against the student was tacitly approved by the school.

Application of the standard involves a case-specific inquiry, taking into account the totality of the circumstances. The Court provides guidance for applying the standard it adopts, including a non-exhaustive list of relevant considerations. (pp. 46-48)

3

6. The Court responds to the dissent. (pp. 48-54)

7. A fiduciary relationship arises when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. A fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care. The Court agrees with the Appellate Division's determination that a public school district "owes obligations to multiple stakeholders involved in educating the district's children, often with conflicting interests," and that the imposition of a fiduciary duty to a specific student would be incompatible with "the duty's defining characteristic of undivided loyalty to a particular person or interest." The Court therefore affirms the Appellate Division's judgment that Hornor's breach of fiduciary duty claim should be dismissed. (pp. 55-57)

8. In light of Hornor's allegations that Hutler sexually assaulted him at Hutler's residence outside of school hours, the Court remands the Hornor matter to the trial court for determination of the Board's motion to dismiss Hornor's vicarious liability claim pursuant to the standard set forth in the Court's opinion. All three plaintiffs in Simpkins have adequately pled vicarious liability claims under that standard, and the Court remands the three matters to the trial court for further proceedings in accordance with its opinion. The judgment of the Appellate Division in Hornor is affirmed in part and reversed in part. The judgment of the Appellate Division in the three matters in Simpkins is reversed. (pp. 57-58)

**AFFIRMED IN PART and REVERSED IN PART.**

**JUSTICE FASCIALE, dissenting**, explains that neither N.J.S.A. 59:2-1.3(a) nor its legislative history support extending vicarious liability to acts committed outside the scope of employment or the adoption of a "tacit approval" standard as a guardrail on such liability. Justice Fasciale would instead hold that public school districts may only be vicariously liable for their employees' tortious sexual acts committed within the scope of their employment, and that such acts fall within the scope of employment in a specific context if: (1) the employee possessed an official, entity-granted in loco parentis relationship to the victim, by which they were given authority and control over the victim; and (2) the employee engaged in the tortious acts during the exercise of that authority in performing entity-assigned duties, or otherwise engaging in a course of conduct subject to the entity's control. Justice Fasciale finds that the vicarious liability claims in Hornor do not meet that standard and should be dismissed but that those in Simpkins do and should be allowed to proceed, though for substantially different reasons than the majority.

**CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE PATTERSON's opinion. JUSTICE FASCIALE filed a dissent.**

4

Russell Forde Hornor,

Plaintiff-Appellant,

v.

Upper Freehold Regional
Board of Education, d/b/a
Upper Freehold Regional
School District, and
Allentown High School,

Defendant-Respondents,

and

New Jersey Future Farmers
of America,

Defendant,

and

Allentown Future Farmers
of America and Charles
Hutler, III,

Defendants.

Ormond Simpkins, Jr.,

Plaintiff-Appellant,

1

v.

South Orange-Maplewood
School District, Columbia
High School, and Maplewood
Middle School,

Defendants-Respondents,

and

New Jersey Department
of Children and Families,
Division of Child Protection
and Permanency, Family
Connections, Inc., and Nicole
Dufault,

Defendants.

---

Frankie Jerome,

Plaintiff-Appellant,

v.

South Orange-Maplewood
School District and
Columbia High School,

Defendants-Respondents,

and

Nicole Dufault,

Defendant.

---

2

Brandon Hayes,

Plaintiff-Appellant,

v.

South Orange-Maplewood
School District, Columbia
High School, and Maplewood
Middle School,

Defendants-Respondents,

and

New Jersey Department
of Children and Families,
Division of Child Protection
and Permanency, Family
Connections, Inc., and Nicole
Dufault,

Defendants.

On appeal from the Superior Court,
Appellate Division.

Argued                  Decided
September 26, 2025       March 11, 2026

Gabriel C. Magee argued the cause for appellant in A-36-24 (Baldante & Rubenstein, attorneys; Gabriel C. Magee, John W. Baldante, Mark R. Cohen, and Jamie L. Hutchinson, on the briefs).

Cherylee O. Melcher argued the cause for respondents in A-36-24 (Hill Wallack, attorneys; Cherylee O. Melcher, on the briefs).

3

John W. Baldante argued the cause for appellants in A-37/38/39-24 (Baldante & Rubenstein, attorneys; John W. Baldante, Gabriel C. Magee, Mark R. Cohen, and Jamie L. Hutchinson, on the briefs).

Roshan D. Shah argued the cause for respondents in A-37/38/39-24 (Shah Law Group, attorneys; Roshan D. Shah, of counsel and on the briefs, and Christopher Khatami, Todd S. McGarvey, Valentina Recchia, and Nina Swinarsky, on the briefs).

Viviana Hanley, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in A-36-24 and A-37/38/39-24 (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, and Stephen Ehrlich, Deputy Solicitor General, of counsel and on the brief, and Viviana Hanley and Marie Cepeda Mekosh, Deputy Attorneys General, on the brief).

Amber R. Long argued the cause for amicus curiae New Jersey Coalition Against Sexual Assault in A-36-24 and A-37/38/39-24 (Levy Konigsberg, attorneys; Amber R. Long, on the brief).

Robert F. Renaud argued the cause for amici curiae New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys in A-36-24 and A-37/38/39-24 (Renaud Colicchio, attorneys; Robert F. Renaud, on the briefs).

Robert E. Levy submitted a brief on behalf of amici curiae Northfield Board of Education, Northfield School District, Northfield Community School, Lincoln Park Board of Education, Lincoln Park School District, and Lincoln Park Elementary School in A-36-24 and A-37/38/39-24 (Scarinci Hollenbeck, attorneys; Robert E. Levy, of counsel and on the briefs, and Seraphema Menna, on the briefs).

4

Jerald J. Howarth submitted a brief on behalf of amicus curiae New Jersey Defense Association in A-36-24 (Howarth & Associates, attorneys; Jerald J. Howarth, on the brief).

Hillary Nappi submitted a brief on behalf of amicus curiae CHILD USA in A-36-24 and A-37/38/39-24 (Hach Rose Schirripa & Cheverie, attorneys; Hillary Nappi, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

These appeals arise from four matters in which the plaintiffs allege that New Jersey public school teachers sexually abused them when they were high school students. The issue common to all the matters is whether N.J.S.A. 59:2-1.3(a)(1), a provision of the Child Victims Act enacted by the Legislature in 2019, authorizes the imposition of vicarious liability on a school district for a teacher's sexual abuse of a student outside the scope of the teacher's employment.

When it enacted the Child Victims Act, the Legislature expanded the rights of child victims of sexual abuse under three existing statutes: the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to :12-3; the Charitable Immunity Act (CIA), N.J.S.A. 2A:53-7 to -11; and the Child Sexual Abuse Act (CSAA), N.J.S.A. 2A:61B-1. In N.J.S.A. 59:2-1.3(a)(1), the Legislature abrogated TCA immunities that would otherwise bar claims against certain public entities in

5

"an action at law for damages as a result of a sexual assault . . . or sexual abuse . . . being committed against a person which was caused by a willful, wanton, or grossly negligent act of the public entity or public employee."  N.J.S.A. 59:2-1.3(a)(1)'s legislative history demonstrates that the Legislature intended that public entity vicarious liability for employees' sexual abuse of children under that statute be subject to the same standard as nonprofit entity vicarious liability for employee child sexual abuse under the CIA, as amended by the Child Victims Act.  The Legislature identified this Court's decision in Hardwicke v. American Boychoir School, 188 N.J. 69, 100-02 (2006), as the governing authority for vicarious liability under the CIA.

In the two appeals before us -- Hornor v. Upper Freehold Regional Board of Education and Simpkins v. South Orange-Maplewood School District (in which three matters were consolidated) -- the Appellate Division held that N.J.S.A. 59:2-1.3(a)(1) does not allow vicarious liability in such settings and ruled that the plaintiffs' vicarious liability claims should be dismissed.

We disagree with the Appellate Division's interpretation of N.J.S.A. 59:2-1.3(a)(1).  We conclude that the provision does not categorically bar the imposition of vicarious liability on a public entity for acts of sexual abuse outside the scope of a teacher's employment, and we therefore reverse the Appellate Division's determination that plaintiffs' vicarious liability claims

6

should be dismissed at the pleading stage. Based upon N.J.S.A. 59:2-1.3(a)(1)'s plain language and legislative history, other legislative action addressing child sexual abuse, this Court's decision in <u>Hardwicke</u>, and the authority on which the Court relied in that decision, we adopt a standard for the determination of vicarious liability claims asserted against public schools pursuant to the statute.

In <u>Hornor</u>, plaintiff raises a second issue: whether the Appellate Division properly reversed the trial court's denial of defendants' motion to dismiss plaintiff's claim for breach of fiduciary duty. We concur with the Appellate Division that a public school does not bear a fiduciary duty to a student and thus affirm the appellate court's judgment on that issue.

We affirm in part and reverse in part the Appellate Division's judgment in <u>Hornor</u>, reverse the Appellate Division's judgment in <u>Simpkins</u>, and remand the four cases to the trial courts for further proceedings in accordance with the vicarious liability standard set forth in this opinion.

## I.

We summarize plaintiffs' factual assertions based on the allegations of their complaints.

A.

1.

Plaintiff's claims in <u>Hornor</u> arise from sexual abuse allegedly committed by Charles Hutler, who died before the action was filed. During the period relevant to the case, Hutler was employed by the Upper Freehold Regional School District as a science teacher at Allentown High School. He also served as an advisor and team coach for the high school's chapter of New Jersey Future Farmers of America (FFA).

In April 1979, plaintiff Russell Forde Hornor was a fifteen-year-old freshman at Allentown High School. He was a student in Hutler's biology class and a member of the FFA chapter Hutler advised.

Hornor alleges that after he told Hutler that he had difficulty finding transportation to his job at a landscaping company, Hutler assisted him by driving him to his job. Hornor further contends that Hutler gained his "trust and friendship" by driving him to FFA events. He asserts that Hutler took him and two friends to movies and to a bowling alley and that Hutler supplied him with alcohol during these outings.

Hornor alleges that in April 1979, Hutler encouraged him to participate in an FFA landscaping contest at Rutgers University, and that he won fourth place in the contest. He states that after the contest, Hutler took him and two

8

friends to a movie and then dropped the friends off at their homes. Hornor asserts that Hutler then took him to his apartment, sexually assaulted him, and instructed him not to say anything about the incident. According to Hornor, he believes that he was abused "in additional ways or on additional occasions," but has "emotionally suppressed partially and/or in whole these additional details and episodes of abuse."

2.

On November 19, 2021, Hornor filed an action against the Upper Freehold Regional Board of Education, Allentown High School, FFA, and Hutler's estate.[1] Hornor alleged that Hutler was a "serial molester and sexual abuser of children," and that school and FFA officials knew or should have known that Hutler had abused or was abusing other students. He claimed that the Upper Freehold Regional Board of Education was vicariously liable for Hutler's sexual abuse and for the actions or inactions of its supervisory employees.

Hornor also asserted direct claims for negligence based on the Upper Freehold Regional Board of Education's alleged failure to properly screen

---

[1] In the Child Victims Act, the Legislature expanded the statute of limitations in civil actions for sexual abuse, prescribing a two-year window for the assertion of certain claims that would otherwise be time-barred. N.J.S.A. 2A:14-2b(a). Plaintiffs in these appeals filed their complaints during that two-year period.

teachers, its alleged failure to properly investigate complaints of sexual abuse and other inappropriate and abusive behavior, and other categories of alleged acts and omissions, as well as negligent hiring, retention, and supervision; gross negligence; intentional infliction of emotional distress; breach of fiduciary duty; and violations of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1.  Hornor sought compensatory damages, punitive damages, and other relief.

The Upper Freehold Board of Education moved to dismiss in part the complaint pursuant to Rule 4:6-2(e), asserting, among other arguments, that Hornor's vicarious liability claims were barred by the TCA and that his breach of fiduciary duty claims failed because a public school district bears no fiduciary duty to a student.

The trial court denied the motion to dismiss.  The court viewed N.J.S.A. 59:2-2(a) to authorize Hornor's vicarious liability claims against the Upper Freehold Regional Board of Education for claims of "sexual abuse inflicted by" its employee's "willful, wanton, or grossly negligent act" occurring within the scope of employment.  The trial court construed N.J.S.A. 59:2-1.3(a)(1) to authorize certain vicarious liability claims against public entities based on public employees' conduct outside the scope of employment, including claims based on a public school's "limited in loco parentis authority" to shield

10

students in its care from sexual abuse. Applying Rule 4:6-2(e)'s motion to dismiss standard, the trial court found that Hornor had pled, at a minimum, "a prima facie demonstration of an in loco parentis relationship between abused and abuser" warranting denial of the motion to dismiss his vicarious liability claims.

The trial court also found that Hornor had presented prima facie evidence supporting his claim for breach of fiduciary duty. It viewed the fiduciary duty between a priest and parishioner that this Court recognized in F.G. v. MacDonell, 150 N.J. 550, 563-65 (1997), to extend to the relationship between a teacher and a student if the teacher "takes affirmative steps beyond the classroom, as Hutler did here, to earn a child's trust and provide counseling beyond mere reading, writing, and arithmetic," and the teacher engages in "grooming" the child in order to sexually abuse him. The trial court therefore denied the motion to dismiss with respect to Hornor's breach of fiduciary duty claim.

### 3.

The Appellate Division granted the Upper Freehold Board of Education's motion for leave to appeal. It reversed the trial court's determination with respect to plaintiff's vicarious liability claims. The appellate court concluded that because Hutler's alleged sexual abuse was

11

outside the scope of his employment, Hornor could not establish a basis for liability under N.J.S.A. 59:2-2. The court reasoned that Hornor's claims were therefore barred by N.J.S.A. 59:2-1(a), which provides that "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury."

The Appellate Division then analyzed the legislative history of the Child Victims Act, concluding that although that Act stripped public entities of the TCA immunities that might otherwise have shielded them in sexual abuse cases, no TCA liability provision authorizes vicarious liability for sexual assault or sexual abuse committed outside the scope of employment. Accordingly, the appellate court found that Hornor lacked a statutory predicate for his vicarious liability claims.

The Appellate Division also reversed the trial court's decision regarding Hornor's claim for breach of fiduciary duty. It rejected Hornor's argument that under this Court's decision in F.G., Hutler's alleged "grooming" of Hornor gave rise to a "special relationship" warranting the imposition of a fiduciary duty.

4.

We granted Hornor's motion for leave to appeal. 260 N.J. 82 (2025). We also granted amicus curiae status to the Attorney General; the New Jersey Coalition Against Sexual Assault (NJCASA); the New Jersey State League of

12

Municipalities (NJSLM) and New Jersey Institute of Local Government Attorneys (NJILGA) (jointly represented); the Northfield Board of Education, Northfield School District, Northfield Community School (Northfield), Lincoln Park Board of Education, Lincoln Park School District, and Lincoln Park Elementary School (Lincoln Park) (jointly represented); the New Jersey Defense Association (NJDA); and CHILD USA.

B.

1.

Plaintiffs' claims in the three cases brought against the South Orange-Maplewood School District arise from sexual abuse allegedly committed by Nicole Dufault. During the relevant period, Dufault taught English and special education at Columbia High School and participated in a summer educational program operated at the school by Family Connections, Inc. and the New Jersey Division of Child Protection and Permanency (DCPP).

Plaintiff Ormond Simpkins, Jr. alleges that in 2013, when he was a fourteen-year-old student at that summer educational program and then a freshman at Columbia High School, Dufault sexually abused him on over two hundred occasions. Simpkins asserts that some of the incidents in which he was abused occurred when he was alone with Dufault in her classroom during the school day after she sent his classmates to the library, and that on other

13

occasions she sexually abused him in her car in the school parking lot during lunch periods and after school, or at a park near the high school.

Plaintiff Frankie Jerome alleges that Dufault sexually abused him eight or nine times during the 2013-2014 school year, when he was a fourteen-year-old freshman at Columbia High School. He claims that Dufault compelled him to give her his cellphone number and texted him sexually explicit messages and photographs. Jerome asserts that Dufault sexually abused him in her classroom during the lunch period and in her car, which was on at least one occasion parked on school property when the abuse occurred.

Plaintiff Brandon Hayes alleges that Dufault initiated sexually explicit conversations and contact with him in the summer of 2011, when he was a fourteen-year-old student at the summer educational program, and that Dufault sexually abused him when she was his freshman English teacher at Columbia High School. He also alleges that Dufault sexually assaulted him in June 2014, when he was a junior at Columbia High School, in her car parked in the parking lot of an apartment complex near the school.

2.

Simpkins, Jerome, and Hayes filed separate complaints. Simpkins and Hayes named as defendants the South Orange-Maplewood School District, Columbia High School, Maplewood Middle School, Family Connections,

14

Dufault, and DCPP; Jerome named as defendants the South Orange-Maplewood School District and Columbia High School.

Simpkins, Jerome, and Hayes asserted claims against the South Orange-Maplewood School District and the two schools for negligence per se under the CSAA; gross negligence; intentional infliction of emotional distress; violations of the LAD; and negligent hiring, retention, and supervision. They asserted claims for breach of fiduciary duty against the schools and a claim for assault and battery against Dufault. They sought compensatory damages, punitive damages, and other relief.

Pursuant to Rule 4:6-2(e), the South Orange-Maplewood School District moved to dismiss plaintiffs' CSAA claims; plaintiffs' vicarious liability claims; "the aspects of all other common law claims seeking to hold [the School District] vicariously liable for Nicole Dufault's alleged misconduct"; and plaintiffs' "stand-alone claim for punitive damages."

The trial court granted the South Orange-Maplewood School District's motion to dismiss. It concluded that as the operator of a public school in which students were present only during the day, the School District did not constitute a "passive abuser" under N.J.S.A. 2A:61B-1(a)(1) and was therefore not liable under the CSAA. The trial court also held that Dufault's alleged sexual abuse of plaintiffs went beyond the scope of her employment because

15

Dufault was neither authorized by the South Orange-Maplewood School District nor acting to serve her employer when she sexually abused the students.

The trial court accordingly dismissed the claims premised on the CSAA and the common law claims in which plaintiffs sought to impose vicarious liability on the South Orange-Maplewood School District. The court also dismissed plaintiffs' stand-alone claim for punitive damages; by stipulation of the parties, the complaints were deemed amended so that the counts that the court did not dismiss were deemed to include a demand for punitive damages.

3.

The Appellate Division granted motions for leave to appeal filed by Simpkins, Jerome, and Hayes, and consolidated the three cases for purposes of appeal. In an opinion issued on the same day as its opinion in Hornor, the appellate court affirmed the trial court's judgment.

As it did in Hornor, the Appellate Division found in Simpkins that the alleged sexual abuser's conduct was outside the scope of her employment, and that vicarious liability could not be imposed absent a provision in the TCA giving rise to predicate liability. The court reasoned that in N.J.S.A. 59:2-2(a), the Legislature waived sovereign immunity only for acts committed within the scope of employment and that "the 2019 Amendments to the [TCA],

16

specifically N.J.S.A. 59:2-1.3, did not change that." The Appellate Division accordingly held that the trial court had properly dismissed plaintiffs' vicarious liability claims.

4.

We granted the motions for leave to appeal filed by Simpkins, Jerome, and Hayes, in which they challenged the Appellate Division's decision affirming the trial court's dismissal of their vicarious liability claims. 260 N.J. 87 (2025); 260 N.J. 89 (2025); 260 N.J. 93 (2025). We also granted the applications of the Attorney General; NJCASA; NJSLM and NJILGA (jointly represented); Northfield and Lincoln Park (jointly represented); and CHILD USA to participate as amici curiae.

II.

Hornor argues that when the Legislature enacted the Child Victims Act, it clearly intended to impose vicarious liability on public entities for sexual assault, regardless of whether a TCA liability provision expressly imposes liability on the public entity. Relying on the Legislature's direction that public entities should be liable for sexual abuse in the same manner as nonprofit and educational entities, he contends that the TCA does not bar or limit his vicarious liability claims. Hornor asserts that he pled facts sufficient to support his claim for breach of fiduciary duty.

17

Simpkins, Jerome, and Hayes also contend that when the Legislature enacted the Child Victims Act, it intended to impose on public entities vicarious liability for sexual assault. They argue that the Appellate Division mistakenly held that a public entity may only be held liable if a TCA provision expressly provides for liability. Simpkins, Jerome, and Hayes view the Child Victims Act to be remedial legislation exempt from the limitations of the TCA.

The Upper Freehold Regional Board of Education argues that the TCA bars Hornor's vicarious liability claims notwithstanding the Legislature's amendments to that statute in the Child Victims Act. It states that the TCA restricts vicarious liability claims against public entities to settings in which employees have acted within the scope of their employment, as the Appellate Division held. The Upper Freehold Regional Board of Education asserts that boards of education and public schools owe no fiduciary duty to their students.

The South Orange-Maplewood Board of Education concurs with the Appellate Division that although the Child Victims Act disabled TCA immunities in sexual abuse claims, N.J.S.A. 59:2-2 limits public entity vicarious liability to claims arising from public employee acts and omissions within the scope of employment.

The Attorney General asserts that because N.J.S.A. 59:2-1.3(a)(1) plainly disables all TCA immunities in public school sexual abuse cases, a

18

plaintiff need not identify an express legislative grant of liability in the TCA in order to assert a claim for vicarious liability. The Attorney General proposes a standard under which a school should incur common law liability if a school official sexually abuses a minor and either (1) the school has been negligent in the hiring, supervision, or retention of the tortfeasor, or (2) the tortfeasor was a supervisor exercising authority delegated to the supervisor by the school and, under the totality of the circumstances, it reasonably appears that the supervisor's misconduct was tacitly approved by the school. In the Attorney General's view, a school district should not be vicariously liable for sexual abuse committed by a teacher who lacks supervisory authority over other school employees.

NJCASA states that the Appellate Division incorrectly construed the Child Victims Act, and that the Legislature's paramount goals of protecting children and identifying abusers are served by the imposition of vicarious liability in cases such as these.

NJSLM and NJILGA assert that under the TCA, public entities can be held vicariously liable for acts of their employees only if the conduct is within the scope of employment and that the sexual abuse at issue in these appeals is outside the teachers' scope of employment.

Northfield and Lincoln Park contend that the Appellate Division's rulings in these matters are consistent with the intent and language of the TCA, and that those rulings leave intact plaintiffs' claims for negligent hiring, supervision, and retention and other related claims based on the employers' conduct.

NJDA argues that vicarious liability cannot be imposed on a public entity for acts outside the employee's scope of employment, and that Hutler's alleged sexual abuse of Hornor was clearly beyond the scope of his job duties.

III.

A.

We review de novo a trial court's determination of a motion to dismiss a complaint for failure to state a claim pursuant to Rule 4:6-2(e). W.S. v. Hildreth, 252 N.J. 506, 518 (2023). "[L]imiting [our] review to the pleadings themselves," we examine "the legal sufficiency of the facts alleged on the face of the complaint." Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019) (first quoting Roa v. Roa, 200 N.J. 555, 562 (2010); and then quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). In that inquiry, a plaintiff is entitled to "every reasonable inference of fact." Printing Mart, 116 N.J. at 746.

20

We also review de novo the trial court's and Appellate Division's interpretation of statutes. Hildreth, 252 N.J. at 518. We conduct that analysis in accordance with familiar principles of statutory construction. Our objective is to "effectuate the Legislature's intent." Ibid. "[T]he best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (citations omitted).

"If, based on a plain and ordinary reading of the statute, the statutory terms are clear and unambiguous, then the interpretative process ends, and we 'apply the law as written.'" State v. J.V., 242 N.J. 432, 443 (2020) (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)). "If, however, the statutory text is ambiguous, we may resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Ibid. (quoting State v. S.B., 230 N.J. 62, 68 (2017)).

"[E]ach part or section" of a statute is "construed in connection with every other part or section to provide a harmonious whole.'" Hildreth, 252 N.J. at 518 (quoting In re Civil Commitment of W.W., 245 N.J. 428, 449 (2021)). "Additionally, when amendments are passed jointly or as part of a legislative scheme, we must construe them together to make sense of the

legislative intent." Id. at 518-19. We "presume that the Legislature is familiar with existing case law" when interpreting statutory language. State v. McCray, 243 N.J. 196, 217 (2020) (quoting Great Atl. & Pac. Tea Co. v. Borough of Point Pleasant, 137 N.J. 136, 148 (1994)).

B.

1.

We first consider the Appellate Division's holding that notwithstanding the Legislature's enactment of N.J.S.A. 59:2-1.3(a)(1), the TCA bars plaintiffs' vicarious liability claims in these appeals. In that inquiry, our task is to determine the Legislature's intent when it amended the TCA through the Child Victims Act.

We begin by reviewing this Court's 2006 decision in Hardwicke, cited in N.J.S.A. 59:2-1.3(a)'s legislative history, and two employment law opinions on which Hardwicke relied in its discussion of vicarious liability: Lehmann v. Toys 'R' Us, 132 N.J. 587, 619-20 (1993) and Abbamont v. Piscataway Township Board of Education, 138 N.J. 405, 429-32 (1994).

This Court's Hardwicke decision arose from the claims of John Hardwicke, a former student at a private boarding school who alleged that the school's music director sexually assaulted him "on an almost daily basis and sometimes several times a day" over a six-month period between October 1970

22

and April 1971, and during a two-week period the following summer. 188 N.J. at 76. The Court viewed the record to demonstrate that the music director controlled several core school functions, including student admissions, the hiring and firing of staff, and the daily life of boarding students who lived at the school seven days a week during the school year. Id. at 75-76.

Hardwicke and his wife asserted claims against the boarding school and the music director for violations of the CSAA, common law claims that included a claim for vicarious liability, and constitutional challenges to the version of the CIA then in effect. Id. at 79.

The trial court dismissed the Hardwickes' claims based on the CSAA. Id. at 80-81. That statute then prescribed a cause of action against "those persons who inflict the abuse (active abusers), and those persons who stand in loco parentis within the household who know of the abuse and who fail to protect the child (passive abusers)," who could "claim an affirmative defense based on a 'reasonable fear' of the active abuser as described by the statute.'" N.J.S.A. 2A:61B-1; see also Hardwicke, 188 N.J. at 86.[2]

---

[2] In the Child Victims Act, the Legislature eliminated the phrase "within the household" from the CSAA. L. 2019, c. 120, § 4.

23

In Hardwicke, the trial court found that the boarding school was not a "person" within the meaning of the CSAA, and it later dismissed the plaintiffs' remaining claims based on the CIA's immunities. See 188 N.J. at 80.

The Appellate Division reversed the trial court's dismissal of plaintiffs' CSAA claims, concluding that the CIA barred only common law claims based on negligence, not claims of intentional misconduct. Hardwicke v. Am. Boychoir Sch., 368 N.J. Super. 72, 86-102 (App. Div. 2004).

Affirming as modified the Appellate Division's judgment, this Court held in Hardwicke that the defendant boarding school constituted a "person" standing "in loco parentis within the household" with respect to the students and therefore could be a "passive abuser" under the CSAA. 188 N.J. at 87-94. It also ruled that the CIA "immunizes simple negligence only, and not 'other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior,'" and therefore did not bar the claims against the school based on the music director's sexual abuse of the plaintiff. Id. at 97 (quoting Schultz v. Roman Cath. Archdiocese of Newark, 95 N.J. 530, 543 (1984) (Handler, J., dissenting)).

At the conclusion of the Hardwicke opinion, this Court briefly addressed the issue of vicarious liability. Id. at 100-02. It rejected the school's argument that "plaintiff's common-law claims against it must fail because the [s]chool

24

cannot be held vicariously liable for the intentional acts of its employees." Id. at 100. The Court did not, however, prescribe a specific standard for claims premised on a nonprofit boarding school's vicarious liability for common-law claims arising from sexual abuse outside the scope of employment. See id. at 100-02. Instead, the Court reiterated the vicarious liability standard it had imposed in the employment settings of Lehmann and Abbamont. Ibid.

In Lehmann, the Court considered an employer's vicarious liability in a workplace sexual harassment case under the LAD. It applied principles from section 219 of the Second Restatement of Agency, which then provided:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
>> (a) the master intended the conduct or the consequences; or
>>
>> (b) the master was negligent or reckless; or
>>
>> (c) the conduct violated a non-delegable duty of the master; or
>>
>> (d) the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

25

[Restatement (Second) of Agency § 219 (Am. L. Inst. 1958) (section 219).][3]

---

[3]    Because the Legislature referred to Hardwicke -- which relied on Lehmann and Abbamont, which, in turn, relied on the Second Restatement of Agency -- we discuss the principles announced in that Restatement. We note, however, that the year before Hardwicke was decided, the American Law Institute adopted the Third Restatement of Agency. Section 7.03(2) of the Third Restatement provides that

> [a] principal is subject to vicarious liability to a third party harmed by an agent's conduct when
>
> > (a) as stated in § 7.07, the agent is an employee who commits a tort while acting within the scope of employment; or
> >
> > (b) as stated in § 7.08, the agent commits a tort when acting with apparent authority in dealing with a third party on or purportedly on behalf of the principal.

Under § 7.08 of the Third Restatement,

> [a] principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission.

Given the Legislature's references to Hardwicke, in which the Court relied on the agency principles of section 219 of the Second Restatement rather than those of the Third Restatement, we do not here reach the question whether to adopt agency principles stated in the Third Restatement.

Addressing the "aided-by-agency" concept set forth in section 219(2)(d), this Court held in Lehmann that in cases "in which the supervisor is acting outside the scope of [the supervisor's] employment," the employer will be liable for the supervisor's behavior if the exceptions set forth in section 219(2) are met. 132 N.J. at 619-20. It noted that "if an employer delegates the authority to control the work environment to a supervisor and that supervisor abuses that delegated authority, then vicarious liability under § 219(2)(d) will follow." Ibid.[4]

The Court prescribed factors in Lehmann to guide "[t]he determination of whether a supervisor who creates a hostile work environment was aided in accomplishing that tort by the power delegated to him or her to control the day-to-day working environment," explaining that the factfinder must conduct a fact-specific analysis to decide (1) whether the employer delegated the authority to the supervisor to control the situation of which the plaintiff

---

[4] In Aguas v. State, decided after Hardwicke, the Court held that "[i]n a hostile work environment sexual harassment case under the LAD in which the plaintiff alleges employer vicarious liability under Restatement § 219(2)(d)" and "no tangible employment action has been taken against the plaintiff," the defendant employer may assert, as an affirmative defense, "that the employer exercised reasonable care to prevent and to correct promptly sexually harassing behavior; and . . . that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm." 220 N.J. 494, 524 (2015) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 746 (1998)).

27

complains; (2) whether the supervisor exercised that authority; (3) whether the exercise of authority resulted in a violation of the LAD; and (4) whether the authority delegated by the employer to the supervisor aided the supervisor in injuring the plaintiff.  Ibid.

In Hardwicke, the Court noted that in Abbamont, it had applied the Lehmann standard to cases brought under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8.  188 N.J. at 102.  The Court found the standard applicable because, like the LAD, CEPA effectuates important public policies to protect workplace victims "'from the improper or unlawful exercise of authority by employers.'"  Id. at 102 (quoting Abbamont, 138 N.J. at 418).  In Hardwicke, in turn, the Court held that "[t]he considerations that informed our analyses in Lehmann and Abbamont apply equally to claims predicated on facts indicating child abuse."  Id. at 102.

In Hardwicke, the Court also identified the CSAA as relevant to the question of vicarious liability, observing that the CSAA "imposes responsibility on those in the best position to know of the abuse and stop it."  Ibid.  It concluded that "application of section 219 of the Restatement to plaintiff's common-law claims advances those goals."  Ibid.

28

2.

The case law discussed above provides important context to the Legislature's 2019 amendment of the TCA in the Child Victims Act.

When it enacted the TCA in 1972, the Legislature followed the "'guiding principle' . . . that 'immunity from tort liability is the general rule and liability is the exception.'" Jones v. Morey's Pier, Inc., 230 N.J. 142, 154 (2017) (quoting D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013)). The Legislature "declared [it] to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of [the TCA]." N.J.S.A. 59:1-2. To that end, the Legislature determined that "[e]xcept as otherwise provided by [the TCA], a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." N.J.S.A. 59:2-1(a).

In N.J.S.A. 59:2-2(a), the Legislature prescribed an exception to its broad grant of immunity for vicarious liability, providing that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." It enacted no provision, however, authorizing the imposition of vicarious liability on public entities for acts and omissions of public employees outside the scope of

29

employment. See generally N.J.S.A. 59:2-1 to -11. That omission was significant; as we have noted, "[o]nly rarely will intentional torts fall within the scope of employment." Davis v. Devereux Found., 209 N.J. 269, 303 (2012). Indeed, in the TCA, the Legislature expressly immunized public entities from vicarious liability "for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2-10.

Accordingly, prior to the enactment of the Child Victims Act in 2019, the TCA barred virtually all claims for public entity vicarious liability arising from public employees' sexual assaults of children. See N.J.S.A. 59:2-1, -2(a), -10.

The Child Victims Act fundamentally altered the law governing civil claims against public entities and certain private entities arising from sexual abuse. Among other statutory revisions, the Legislature amended the CIA as applied to actions for the sexual abuse of children. See L. 2019, c. 120, § 5. It revised N.J.S.A. 2A:53A-7(c) to provide in part that

> [n]othing in this section shall be deemed to grant immunity to . . . any nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes, or its trustee, director, officer, employee, agent, servant or volunteer, causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault, any other crime of a sexual

30

nature, a prohibited sexual act as defined in [N.J.S.A. 2A:30B-2], or sexual abuse as defined in [N.J.S.A. 2A:61B-1].

The Senate Judiciary Committee explained that another provision of the Child Victims Act, L. 2019, c. 120, § 2, which addressed the statute of limitations for claims governed by the CIA,

> would establish retroactive application of the standard of liability set forth in [N.J.S.A. 2A:53A-7], as amended by the bill in section 5. This could create, for child victim lawsuits filed under the new, extended statute of limitations, additional retroactive liability for non-profit organizations organized exclusively for religious, charitable, educational, or hospital purposes concerning willful, wanton or grossly negligent acts resulting in abuse that occurred prior to August 8, 2006. That date is when the New Jersey Supreme Court decided the case of Hardwicke v. American Boychoir School, 188 N.J. 69 (2006), and found for the first time that the Charitable Immunity Act does not bar lawsuits against organizations based on such aggravated forms of wrongful conduct; it only bars suits based on "simple" or "standard" negligent conduct (with some statutorily carved out exceptions). . . . The bill's amendment to the Charitable Immunity Act, to be applied retroactively, recognizes the current interpretation and scope of organizational liability based on Hardwicke.
>
> [S. Judiciary Comm. Statement to S. Comm. Sub. for S. 477 2 (Mar. 7, 2019).]

Accordingly, N.J.S.A. 2A:53A-7, as amended by the Child Victims Act, "codifie[d] what was already understood via case law since August 8, 2006 -- that organizational charitable immunity only applies to protect organizations

31

from lawsuits claiming injury based on merely negligent acts, not more aggravated forms of wrongful conduct, such as willful, wanton or grossly negligent acts." Id. at 6.

In the Child Victims Act provision at the center of these appeals, now codified at N.J.S.A. 59:2-1.3(a), the Legislature amended the TCA as it applied to certain civil claims arising from sexual abuse. The first version of that provision, passed by the Legislature and submitted to Governor Philip D. Murphy, provided only that

> [n]otwithstanding any other provision of law to the contrary, including but not limited to the [TCA], a public entity is liable in an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in [N.J.S.A. 2A:30B-2], or sexual abuse as defined in [N.J.S.A. 2A:61B-1].
>
> [L. 2019, c. 120, § 7.]

On May 13, 2019, Governor Murphy signed L. 2019, c. 120 into law. The Governor noted, however, that he signed the bill "based on a commitment from the bill's sponsors to introduce and swiftly pass a bill that will correct an error in the section of the bill relating to the liability of public entities." Governor's Statement on Signing S. Comm. Sub. for S. 477 (May 13, 2019) (Governor's Signing Statement). Governor Murphy explained that the section of the bill regarding public entity liability "inadvertently fails to establish a

32

standard of proof for cases involving claims filed against public entities" and that, "[i]f unaddressed, the lack of clarity would create uncertainty and likely lead to additional litigation." Ibid. Governor Murphy stated that he had "received assurances that the Legislature will correct this omission by clarifying that public entities should be held to the same standard of liability that is applied to religious and nonprofit organizations. Applying a different standard would be unjustified." Ibid.

The Legislature then enacted L. 2019, c. 239, signed into law on August 9, 2019 and codified at N.J.S.A. 59:2-1.3(a). It provides that

> [n]otwithstanding any provision of the [TCA] to the contrary:
>
> (1) immunity from civil liability granted by that act to a public entity or public employee shall not apply to an action at law for damages as a result of a sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in [N.J.S.A. 2A:30B-2], or sexual abuse as defined in [N.J.S.A. 2A:61B-1] being committed against a person, which was caused by a willful, wanton or grossly negligent act of the public entity or public employee; and
>
> (2) immunity from civil liability granted by that act to a public entity shall not apply to an action at law for damages as a result of a sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in [N.J.S.A. 2A:30B-2], or sexual abuse as defined in [N.J.S.A. 2A:61B-1] being committed against a minor under the age of

> 18, which was caused by the negligent hiring, supervision or retention of any public employee.

[N.J.S.A. 59:2-1.3(a).]

The Sponsor's Statement to the bill enacted as L. 2019, c. 239 explained that the "bill establishes new liability standards in sexual abuse lawsuits filed against public entities and public employees" that "are identical to the liability standards applied to non-profit organizations, and their officers, employees and other agents, based on exceptions to the immunity granted to such organizations and agents under the [CIA]." Sponsor's Statement to A. 5392 2-3 (May 13, 2019). In its Statement to the bill, the Assembly Budget Committee characterized the two categories of actions identified in N.J.S.A. 59:2-1.3(a)(1) and (2) to be, for public entity and public employee cases, "the same types of lawsuits for which the general statutory immunity of the [CIA] does not apply, thereby permitting such lawsuits to proceed against non-profit organizations organized exclusively for religious, charitable, educational, or hospital purposes, and their trustees, directors, officers, employees, agents, servants and volunteers." Assemb. Budget Comm. Statement to A. 5352 (June 17, 2019).

The Child Victims Act -- including the revised version of N.J.S.A. 59:2-1.3(a) enacted as L. 2019, c. 239 -- became effective on December 19, 2019.

34

More than five years later, the Legislature amended N.J.S.A. 59:2-1.3 to address only a narrow question of damages in sexual abuse claims under that provision, adding a subsection stating that "[t]he recovery limits set forth under subparagraph (a) of paragraph (2) of subsection d. of N.J.S.A. 59:9-2 shall not apply to an action at law filed pursuant to this section."  See L. 2025, c. 29 (codified at N.J.S.A. 59:2-1.3(c)).  In the legislative history of that amendment, however, the Senate Judiciary Committee reaffirmed the intent of the TCA amendments enacted in 2019.  Citing L. 2019, c. 120 and L. 2019, c. 239, the Committee stated that "[t]he list of acts for which pain and suffering damages may be awarded against a public entity or public employee" was based on

> the list of acts of abuse for which the Legislature previously eliminated immunity from civil liability for governmental actors under the [TCA], applied new, extended statute of limitations periods for victims to file civil actions against such public actors, and made them generally liable in any such action in the same manner as private parties.
>
> [S. Judiciary Comm. Statement to S. 3564 (Oct. 24, 2024).]

3.

Against that backdrop, we review the Appellate Division's determination that notwithstanding N.J.S.A. 59:2-1.3(a)(1)'s abrogation of TCA immunities, plaintiffs' claims in these cases are barred by the TCA because they do not fall

35

within N.J.S.A. 59:2-2(a) or another TCA provision expressly providing for public entity or public employee liability. For the reasons explained below, we do not concur with the Appellate Division's construction of N.J.S.A. 59:2-1.3(a)(1) and the other TCA provisions on which the court relied.

In the many matters in which the TCA confers broad immunities on public entities, the statute's liability provisions define exceptions to the general rule of immunity. See N.J.S.A. 59:2-1(a) (providing immunity to public entities "[e]xcept as otherwise provided by this act"); Tice v. Cramer, 133 N.J. 347, 355 (1993) ("Public entities are not liable for an injury, except as such liability may be provided for in the Act."); accord Polzo v. County of Essex, 196 N.J. 569, 578 (2008); Rochinsky v. Dep't of Transp., 110 N.J. 399, 407-08 (1988). N.J.S.A. 59:2-2(a), which authorizes the imposition of liability on a public entity "for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances," constitutes one such exception to the general rule of public entity immunity under the TCA.

In the wake of the Child Victims Act, however, that broad general rule of immunity no longer applies to claims premised on sexual assault and other sexual misconduct as described in N.J.S.A. 59:2-1.3(a)(1). The provision's

36

plain language makes clear that for cases governed by that statute, the Legislature intended to eliminate all immunities that the TCA otherwise confers on public entities and public employees in civil actions. N.J.S.A. 59:2-1.3(a)'s opening clause -- "[n]othwithstanding any provision of the [TCA] to the contrary" -- reflects that any TCA provision that confers immunity in other settings simply does not apply to sexual assault and sexual misconduct claims within the scope of that statute. See Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993) ("[I]n construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."); accord Kennedy v. Weichert Co., 257 N.J. 290, 310 (2024). The statutory text that follows the "notwithstanding" clause in N.J.S.A. 59:2-1.3(a)(1) similarly conveys the provision's intentionally broad reach.[5]

The Legislature's plain language -- its abrogation of TCA immunities in sexual assault cases within N.J.S.A. 59:2-1.3(a)(1) -- constitutes the "'clear and unequivocal statement of the Legislature'" necessary for an effective

---

[5] N.J.S.A. 59:2-1.3(a) makes clear that it abrogates only TCA immunities, not immunities conferred by another source of law. See A. Budget Comm. Statement to A. 5392 (June 17, 2019) (noting that "any available immunity for public entities and public employees from some source of law" other than the TCA may be raised by "public entities and public employees as a defense" to a sexual abuse lawsuit in any of the categories of actions covered by the statute).

waiver of sovereign immunity. Royster v. State Police, 227 N.J. 482, 494 (2017) (quoting Allen v. Fauver, 167 N.J. 69, 77 (2001)). The Legislature plainly intended that in the discrete category of sexual assault and sexual misconduct claims governed by that provision, no TCA immunity will apply. See S. Jud. Comm. Statement to S. 3564.

Accordingly, since the Child Victims Act's effective date, no TCA immunities protect public entities and public employees in sexual assault and sexual misconduct civil actions governed by N.J.S.A. 59:2-1.3(a)(1). That includes two immunities directly relevant here: N.J.S.A. 59:2-1(a)'s general immunity for public entities, and N.J.S.A. 59:2-10's specific immunity for a public entity sued for a public employee's acts or omissions "constituting a crime, actual fraud, actual malice, or willful misconduct." Although liability provisions such as N.J.S.A. 59:2-2(a) continue to define the discrete settings in which claims may be brought against public entities or public employees in TCA cases not governed by N.J.S.A. 59:2-1.3(a), they no longer prescribe exceptions to those immunities for the claims at issue here. It is therefore unnecessary for a vicarious liability claim brought pursuant to N.J.S.A. 59:2-1.3(a)(1) to fit within a TCA liability provision such as N.J.S.A. 59:2-2(a).

That conclusion is underscored by N.J.S.A. 59:2-1.3(a)'s legislative history, which makes clear that under the bill passed by the Legislature, the

38

TCA's immunities are eliminated in actions governed by the new statute. S. Jud. Comm. Statement 1-2 (Mar. 7, 2019); Governor's Signing Statement; Sponsor's Statement to A. 5392 at 2-3 (L. 2019, c. 239). The Legislature, moreover, clearly intended that public entities subject to N.J.S.A. 59:2-1.3 and nonprofit organizations subject to the CIA face equivalent liability standards. Ibid. If the Appellate Division were correct that public entities cannot be held vicariously liable under N.J.S.A. 59:2-1.3(a)(1) unless a TCA provision expressly authorizes that liability, the standards applied to nonprofit entities and public entities could not be the same.

We therefore hold that, by virtue of N.J.S.A. 59:2-1.3(a)(1), the Legislature has eliminated the immunities to which the public entities in these appeals would otherwise be entitled, and vicarious liability claims against a public entity for a public employee's sexual misconduct under N.J.S.A. 59:2-1.3(a)(1) are not categorically barred if the sexual misconduct alleged is beyond the scope of employment. We do not view the TCA to immunize the defendant school districts in these appeals.

4.

Accordingly, we must determine the standard a plaintiff must satisfy to establish the vicarious liability of a public school under N.J.S.A. 59:2-1.3(a)

39

for a claim based on a teacher's sexual assault of, or sexual misconduct against, a student.

As the Legislature made clear, a plaintiff may assert a direct claim against a school district under N.J.S.A. 59:2-1.3(a)(2) for "negligent hiring, supervision, or retention of any public employee," limited to cases in which damages to a minor victim resulted from sexual assault and other sexual misconduct as defined in that provision. That direct claim is subject to a negligence standard as the statute prescribes. N.J.S.A. 59:2-1.3(a)(2).

With respect to a vicarious liability claim against a public entity under N.J.S.A. 59:2-1.3(a)(1), we adopt a standard that includes some of the factors recommended by the Attorney General in these appeals, with modifications as explained below. We base that standard on N.J.S.A. 59:2-1.3(a)'s statutory text and legislative history, the Legislature's approach to "passive abuser" liability under the CSAA, this Court's decision in <u>Hardwicke</u>, and the <u>Lehmann</u> and <u>Abbamont</u> decisions on which <u>Hardwicke</u> relied.

First, with respect to vicarious liability, the Legislature clearly did not intend that a public entity sued pursuant to N.J.S.A. 59:2-1.3(a)(1) should be subject to a standard akin to strict liability in a sexual assault claim, but chose instead to impose meaningful parameters on such a claim. <u>See</u> <u>Governor's Signing Statement</u>; <u>Sponsor's Statement to A-5392</u> at 2-3.

40

The Legislature's caution is not surprising, given that vicarious liability claims under N.J.S.A. 59:2-1.3 constitute a rare exception to the general rule that employers are vicariously liable only for their employees' acts and omissions within the scope of employment. See G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019) ("For liability to attach to an employer under the doctrine of respondeat superior, the plaintiff must prove the existence of an employer-employee relationship and that the employee's tortious actions 'occurred within the scope of that employment.'" (quoting Carter v. Reynolds, 175 N.J. 402, 409 (2003))). That exception must be carefully defined, lest it swallow the general rule.

Second, limiting the circumstances in which a public entity may be subject to vicarious liability comports with the Legislature's nuanced approach when it enacted the CSAA, the statute that was the primary basis for the claims in Hardwicke. See N.J.S.A. 2A:61B-1; Hardwicke, 188 N.J. at 84-99. The Legislature expressly limits "passive abuser" liability under the CSAA to persons standing in loco parentis who know of the sexual abuse of a child but fail to protect the child. N.J.S.A. 2A:61B-1. It thus focuses the inquiry on such persons' knowledge of the abuse and failure to act to prevent it, not on their status alone. Ibid.

41

Third, we find no evidence that the Legislature sought to predicate vicarious liability solely on an alleged sexual abuser's employment as a teacher in a given school district. As the United States Supreme Court has observed, vicarious liability for an employee's intentional acts outside the scope of employment under Restatement (Second) § 219(2)(d) "requires the existence of something more than the employment relation itself." Ellerth, 524 U.S. at 760. Any standard that would make a public school liable for sexual abuse and sexual misconduct committed by their employees in cases subject to N.J.S.A. 59:2-1.3(a) based solely on the employment relationship would expand vicarious liability under that statute far beyond its intended bounds.

Fourth, the Legislature's reliance on Hardwicke, in which this Court invoked the Lehmann standard of vicarious liability under the LAD, suggests that it instead envisioned a fact-specific analysis of school officials' acts and omissions as they relate to a school employee's sexual abuse of a student. See Hardwicke, 188 N.J. at 100-02; Lehmann, 132 N.J. at 620. In Hardwicke, the Court stressed the boarding school's alleged grant of unfettered authority to the music director to oversee virtually all aspects of student life, the claims that other school officials knew and approved of the sexual abuse of students, and the school's alleged concealment of the abuse from parents and authorities. 188 N.J. at 75-79.

42

Moreover, the <u>Lehmann</u> and <u>Abbamont</u> decisions on which <u>Hardwicke</u> relied stress the importance of incentivizing employers to implement and enforce meaningful policies against sexual harassment in the workplace. See <u>Lehmann</u>, 132 N.J. at 621 ("[T]he existence of effective preventative mechanisms provides some evidence of due care on the part of the employer."); <u>Abbamont</u>, 138 N.J. at 418 (noting that in LAD and CEPA cases, "employers are best situated to avoid or eliminate impermissible vindictive employment practices, to implement corrective measures, and to adopt and enforce employment policies that will serve to achieve the salutary purposes of the respective legislative mandates"). Accordingly, any standard imposed for claims asserted under N.J.S.A. 59:2-1.3(a)(1) should incentivize school officials to vigilantly guard against the sexual abuse of students through the implementation and enforcement of effective policies against sexual abuse, training of employees, age-appropriate instruction of students, or other measures that may be appropriate to a specific school setting. The presence or absence of such policies should be a factor in the analysis.

In light of the Legislature's reliance on <u>Hardwicke</u>, our analysis is informed by the four-part <u>Lehmann</u> standard for LAD sexual harassment claims that the Court cited in <u>Hardwicke</u>. See <u>Hardwicke</u>, 188 N.J. at 100-02 (citing <u>Lehmann</u>, 132 N.J. at 619-20). That standard, however, was designed

43

for sexual harassment claims brought by employees in the workplace, not claims based on the sexual abuse of students in a public school. See ibid. We do not consider certain elements of that standard to be appropriate to the public school setting in which these appeals arose.

In a sexual harassment hostile work environment case, the question whether the alleged harasser is a "supervisor" for purposes of the LAD is a core consideration when a court applies the agency principles set forth in section 219(2)(d) of the Second Restatement. Aguas v. State, 220 N.J. 494, 525 (2015); Lehmann, 132 N.J. at 620. In the LAD context, a supervisor is defined "to include not only employees granted the authority to make tangible employment decisions, but also those placed in charge of the complainant's daily work activities," consistent with the "the two different settings envisioned by [section 219(2)(d) of the Second Restatement]." Aguas, 220 N.J. at 528. In a public school, however, a teacher, coach, or other school employee who lacks supervisory authority over other employees may nonetheless exercise substantial control over the educational environment of students in the classroom, school sports, or other school-related activities.

We therefore decline the Attorney General's invitation to limit public school vicarious liability claims under N.J.S.A. 59:2-1.3(a)(1) to settings in which the sexual abuse or sexual misconduct is alleged to have been

44

committed by a "supervisor" as that term is used in <u>Lehmann</u>, which could exclude most teachers and coaches notwithstanding their broad authority over students. Instead, the authority that the school has delegated to a particular teacher or other school employee to control students' educational environment should be assessed on a case-by-case basis.

In addition, <u>Lehmann</u>'s third requirement -- that the supervisor's exercise of authority resulted in a LAD violation -- is clearly irrelevant to a claim premised on N.J.S.A. 59:2-1.3(a)(1). Instead, under the standard governing claims under N.J.S.A. 59:2-1.3(a)(1), a court should consider whether the teacher's or coach's exercise of the authority to control the student's educational environment resulted in the sexual abuse and sexual misconduct giving rise to such claims.

We also view <u>Lehmann</u>'s fourth requirement -- that the authority delegated by the employer to the supervisor aided the supervisor in injuring the plaintiff -- to potentially authorize a vicarious liability claim against a school premised on nothing more than the alleged sexual abuser's employment status as a teacher. Instead, we tether vicarious liability to a determination that, under the totality of the circumstances, it reasonably appeared that the school employee's sexual abuse or other sexual misconduct involving the student was tacitly approved by the school. That requirement focuses the inquiry on the

45

knowledge and culpability of school officials and other school employees in a position to prevent or stop the abuse. See N.J.S.A. 2A:61B-1; Hardwicke, 188 N.J. at 100-02; Lehmann, 138 N.J. at 619-20; accord Abbamont, 138 N.J. at 417.

For those reasons, deciding only the questions raised in the cases before us, we hold that in order for a plaintiff to prevail in a vicarious liability claim in an action at law for damages under N.J.S.A. 59:2-1.3(a)(1) against a public school arising from a school employee's sexual abuse of or sexual misconduct against a student caused by a willful, wanton, or grossly negligent act of the school employee, the factfinder must determine that:

> (1) The school gave the employee who allegedly committed sexual abuse or other sexual misconduct described in N.J.S.A. 59:2-1.3(a)(1) the authority to control the student's educational environment;
>
> (2) the school employee's exercise of that authority resulted in the sexual abuse or sexual misconduct; and
>
> (3) it reasonably appeared that the school employee's sexual abuse of or sexual misconduct against the student was tacitly approved by the school.

Application of the standard involves a case-specific inquiry, taking into account the totality of the circumstances.[6] Relevant considerations may

---

[6] To the extent that there is any suggestion that this standard imposes strict liability on public schools in N.J.S.A. 59:2-1.3(a) claims for sexual assault and sexual misconduct, we emphasize that it does not. The test set forth in this

46

include (a) any policies, training, or other procedures implemented by the school to prevent or address the sexual abuse of students; (b) whether those policies or other procedures were enforced by the school; (c) the circumstances under which the sexual abuse or other sexual misconduct commenced and continued; (d) whether the abuse took place on school property, at school-related events at off-campus locations, or in settings unconnected to the school; (e) whether the sexual abuse or other sexual misconduct took place during school hours; and (f) whether the abuse was reported to school officials or other school employees, and if so, how and when those officials or employees responded to such a report. The list of factors is not exclusive; additional considerations may be pertinent to a particular case.

The factfinder's determination whether it reasonably appeared that the school employee's sexual abuse of or sexual misconduct against a student was tacitly approved by the school is informed by the factors applicable to a given case. For example, if a teacher committed sexual abuse or misconduct under N.J.S.A. 59:2-1.3(a)(1) against a student, and the conduct occurred in the teacher's classroom over a period of days or weeks and school officials in the vicinity who reasonably should have been aware of the abuse did not

opinion is premised on a careful inquiry into the acts and omissions of a defendant school in the factual setting of a given case. It is by no means a strict liability standard.

47

intervene, a factfinder may reasonably find that the school tacitly approved the abuse. Similarly, if a student reported such sexual abuse or misconduct by a teacher and the school failed to investigate the allegation, a factfinder may reasonably conclude that the school tacitly approved the abuse. These examples are not exclusive; the third factor of the test we announce today may be satisfied in other factual settings.

5.

Our dissenting colleague's analysis derives from two contentions about the Legislature's intent when it enacted the Child Victims Act. For the reasons that follow, we respectfully disagree with both contentions.

First, the dissent concludes that notwithstanding the Legislature's enactment of N.J.S.A. 59:2-1.3(a), claims under that statute are subject to N.J.S.A. 59:2-2(a)'s limitation of public entity vicarious liability to "injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual in like circumstances." Post at ___ (slip op. at 4-5, 11-21). The dissent therefore views N.J.S.A. 59:2-1.3(a) to lack "a predicate for holding entities liable for employee acts committed outside their scope of employment." Post at ___ (slip op. at 18).

48

We disagree. We do not view N.J.S.A. 59:2-2(a) to limit N.J.S.A. 59:2-1.3(a) vicarious liability claims against public schools for teachers' sexual abuse of or sexual misconduct against their students.

For cases governed by the TCA's broad immunities, the Legislature enacted N.J.S.A. 59:2-2(a) to create a discrete exception to those immunities, authorizing the imposition of vicarious liability on public entities for public employee acts and omissions within the scope of employment as defined by that provision. By virtue of the Child Victims Act, however, TCA immunities no longer protect public entities in certain sexual assault and sexual misconduct cases. See N.J.S.A. 59:2-1.3(a)(1). In the limited category of claims governed by N.J.S.A. 59:2-1.3(a), a public entity is no longer entitled to any TCA immunity, and N.J.S.A. 59:2-2(a) no longer prescribes an exception to such an immunity.

The dissent's interpretation of N.J.S.A. 59:2-1.3(a) would defeat the fundamental goal of the Child Victims Act. When it enacted that statute, the Legislature expressly sought to expand the rights of sexual assault and sexual misconduct victims in the specific settings it addressed. See S. Judiciary Comm. Statement to S. Comm. Sub. for S. 477 2 (Mar. 7, 2019) (noting the Legislature's intent to "expand the categories of potential defendants in civil actions" within the statute's scope); Governor's Signing Statement

49

(commenting that "supporters of the bill rightly note that it greatly increases the ability of victims of sexual abuse to pursue justice through the court system"); Assemb. Budget Comm. Statement to A. 5352 (June 17, 2019) (stating that the Act "establishes new liability standards in sexual abuse lawsuits filed against public entities and public employees").

If N.J.S.A. 59:2-2(a)'s scope-of-employment constraint in sexual assault and sexual misconduct cases were deemed to govern claims brought under N.J.S.A. 59:2-1.3(a), the Legislature's goal of expanding public entity liability for public employee sexual assault and sexual misconduct could not be achieved.

For decades, New Jersey courts have applied the "purpose to serve" standard set forth in Restatement (Second) of Agency § 228 to determine whether an employee's act or omission is within the scope of employment. See Davis, 209 N.J. at 303 (applying the Restatement standard); accord Cosgrove v. Lawrence, 215 N.J. Super. 561, 562-63 (App. Div. 1987); DiCosala v. Kay, 91 N.J. 159, 169 (1982); see also Rogers v. Jordan, 339 N.J. Super. 581, 586 (App. Div. 2001) (noting, in a case applying N.J.S.A. 59:2-2(a), that this Court "has turned to the Restatement when the issue is whether an employee has acted within the scope of . . . employment") (citing DiCosala, 91 N.J. at 169).

As this Court explained more than forty years ago, under the Restatement test, "[c]onduct is generally considered to be within the scope of employment if[] 'it is of the kind [that the employee] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the'" employer. DiCosala, 91 N.J. at 169 (fourth alteration in original) (quoting Restatement (Second) of Agency § 228). As our dissenting colleague notes, "'[t]his purpose to serve' standard virtually always excludes an employee's sexual misconduct because such conduct cannot be thought, in any way, to further an employer's interests." Post at ___ (slip op. at 38). Under that test, a teacher's sexual abuse of or sexual misconduct involving a student simply cannot be construed to be within the scope of the teacher's employment; to the contrary, such abuse or misconduct is antithetical to a teacher's educational mission. Thus, if claims under N.J.S.A. 59:2-1.3(a) for such abuse or misconduct were subject to N.J.S.A. 59:2-2(a), they would necessarily fail.

When we interpret statutes, we presume that the Legislature is aware of existing case law. McCray, 243 N.J. at 217. The Legislature is presumed to have known, when it enacted the Child Victims Act, that if N.J.S.A. 59:2-2(a) were to apply to sexual assault and sexual misconduct cases governed by N.J.S.A. 59:2-1.3(a), the "purpose to serve" standard would categorically bar

51

child sexual abuse and misconduct victims from asserting vicarious liability claims against public entities in such cases. It is inconceivable that the Legislature, having enacted N.J.S.A. 59:2-1.3(a) to create a new category of claims, would then eliminate precisely the same claims by virtue of N.J.S.A. 59:2-2(a).

As a general rule, we avoid interpreting "a statute in a way that 'leads to an absurd result.'" State v. Williams, 218 N.J. 576, 586 (2014) (quoting DiProspero, 183 N.J. at 493). We decline to do so here.

The Legislature's identification of Hardwicke as a model for the standard governing claims under N.J.S.A. 59:2-1.3(a) underscores its intent not to limit public entity vicarious liability in these cases to public employee acts and omissions within the scope of employment. As our dissenting colleague observes, N.J.S.A. 59:2-2(a) has no analogue in the CIA, which governs the claims asserted in Hardwicke. Post at ___ (slip op. at 25-27). If the Legislature intended to retain N.J.S.A. 59:2-2(a)'s scope-of-employment restriction for N.J.S.A. 59:2-1.3(a) claims, the standards governing public employees and the standards governing charitable entities under Hardwicke could not be reconciled.

We therefore do not share the dissent's view that N.J.S.A. 59:2-2(a) governs public entity vicarious liability claims asserted under N.J.S.A. 59:2-1.3(a).

Second, the dissent faults our analysis because it "begins and ends with Hardwicke," post at ___ (slip op. at 15), a decision it views to have "nothing to do with the TCA," post at ___ (slip op. at 25). The dissent speculates that the Legislature's references to Hardwicke were unrelated to the Court's holding on vicarious liability, see Hardwicke, 188 N.J. at 100-02, but instead apply solely to Hardwicke's observation that, by its plain language, the CIA immunized charitable entities only for "simple negligence," not for other forms of tortious conduct, id. at 97, 99. Post at ___ (slip op. at 23-25).

We rely on Hardwicke in these appeals because the Legislature identified that decision -- and no other -- for the standard of liability to be imposed on charitable organizations for sexual assault and sexual misconduct cases under the CIA, and directed that claims against public entities for their employees' sexual abuse and sexual misconduct be governed by an analogous standard. See S. Judiciary Comm. Statement 2. By virtue of the Legislature's references to Hardwicke, this Court's vicarious liability discussion in that decision is clearly relevant to the vicarious liability question at the heart of these appeals. We do not share the dissent's view that in our determination of

53

a vicarious liability standard under N.J.S.A. 59:2-1.3, <u>Hardwicke</u> should be dismissed as irrelevant to this case.

Accordingly, we respectfully disagree with our dissenting colleague's interpretation of N.J.S.A. 59:2-1.3(a) and N.J.S.A. 59:2-2(a).  <u>See</u> <u>post</u> at ___ (slip op. at 4-5, 11-21).

Finally, we note the dissent's proposal of a novel standard for determining whether "a public school employee's willful, wanton, or grossly negligent sexual acts fall within their scope of employment," and the dissent's detailed explanation of the basis for and contours of such a standard.  <u>Post</u> at ___ (slip op. at 7-10, 28-60).  No party to these appeals has asked us to decide whether New Jersey's longstanding "purpose to serve" test for determining scope-of-employment questions should be abandoned or altered.  That issue has not been briefed or argued by the parties or amici at any stage.  It has not been considered by the trial courts or the Appellate Division panel that ruled on these cases.  We respectfully decline to address in these appeals the dissent's proposed new scope-of-employment test.[7]

---

[7]  The dissent contends that the standard adopted here for vicarious liability claims under N.J.S.A. 59:2-1.3 addresses a question "not briefed by the parties."  <u>Post</u> at ___ n. 5 (slip op. at 9 n.5).  That is inaccurate; in their briefs and arguments before this Court, the parties vigorously disputed the standard that should govern such claims in the wake of the Child Victims Act, and that standard was a central issue in this appeal.  In contrast, the "purpose to serve" test that has long governed scope-of-employment questions was not discussed

54

6.

We view the standard set forth in this opinion to comport with the Legislature's intent as reflected in the statutory text and legislative history of the Child Victims Act. See N.J.S.A. 59:2-1.3(a)(1); Hardwicke, 188 N.J. at 100-02; Lehmann, 138 N.J. at 619-20; accord Abbamont, 138 N.J. at 417. The Legislature, of course, has the authority to amend its statutes to clarify its intent. Johnson v. Wilkerson, 262 N.J. 75, 89 (2025).

D.

Finally, we consider Hornor's challenge to the Appellate Division's decision reversing the trial court's denial of defendants' motion to dismiss his claim for breach of fiduciary duty.

We concur with the Appellate Division's ruling that a school district has no fiduciary duty to a student. A fiduciary relationship "arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." F.G., 150 N.J. at 563 (citing Restatement (Second) of Torts § 874 cmt. a (Am. L. Inst.

---

-- let alone contested -- in the parties' briefs or arguments. Indeed, nothing in the TCA suggests that the scope-of-employment test under N.J.S.A. 59:2-2 should be different in public school employee sexual assault claims from the scope-of-employment standard that governs any other claim. In advocating a new scope-of-employment standard in such cases, the dissent ventures far from the TCA's language and intent.

1979)). "The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care." Id. at 564 (citing Restatement (Second) of Trusts §§ 170, 174 (Am. L. Inst. 1959)). "Accordingly, the fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." Ibid. (citing Restatement (Second) of Torts § 874).

As the Appellate Division noted, quoting In re Estate of Carter, 6 N.J. 426, 436 (1951), "undivided loyalty is of the very essence of a trust relationship." In contrast, the appellate court observed, a public school district "owes obligations to multiple stakeholders involved in educating the district's children, often with conflicting interests," and the imposition of a fiduciary duty to a specific student would be incompatible with "the duty's defining characteristic of undivided loyalty to a particular person or interest." This Court has previously held that the duty of care that school personnel owe to the school's students is not a fiduciary obligation but a duty "to exercise reasonable care for the safety of students entrusted to them." Frugis v. Bracigliano, 177 N.J. 250, 270 (2003) (quotation omitted). In short, a public school district bears no fiduciary duty to a student in the setting of the Hornor appeal.

We agree with the Appellate Division that this Court's decision in F.G. provides no support for the imposition of a fiduciary duty on a board of education to a student in the district, given the stark distinction between the setting of that decision and the circumstances here. We concur with the Appellate Division's rejection of the notion that a teacher's "long-term, methodical grooming" of a student could give rise to a fiduciary relationship, because the trust and confidence that characterize a fiduciary relationship and "[g]rooming a student for sexual abuse" are "antithetical to one another."

We therefore agree with the Appellate Division that the trial court erred when it declined to dismiss Hornor's breach of fiduciary duty claim pursuant to Rule 4:6-2(e).

IV.

We afford to plaintiffs in both appeals every reasonable inference of fact in accordance with Printing Mart. In light of Hornor's allegations that Hutler sexually assaulted him at Hutler's residence outside of school hours, we remand the Hornor matter to the trial court for determination of the Upper Freehold Board of Education's Rule 4:6-2(e) motion to dismiss Hornor's vicarious liability claim pursuant to the standard set forth in the opinion. We hold that in Simpkins, in which plaintiffs allege that Dufault sexually assaulted plaintiffs on school grounds during the school day, all three plaintiffs have

57

adequately pled vicarious liability claims under that standard in accordance with Rule 4:6-2(e).  We remand the three matters in <u>Simpkins</u> to the trial court for further proceedings in accordance with this opinion.

We make no determination as to whether any of the claims in the four cases should be dismissed on summary judgment under <u>Rule</u> 4:46-2 following discovery; that determination is for the trial courts assigned to these matters, applying the standard set forth in this opinion.

The judgment of the Appellate Division in <u>Hornor</u> is affirmed in part and reversed in part.  The judgment of the Appellate Division in <u>Simpkins</u>, which includes the judgments in the <u>Simpkins</u>, <u>Jerome</u> and <u>Hayes</u> cases, is reversed. All four matters are remanded to the trial courts for further proceedings in accordance with this opinion.

CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE PATTERSON's opinion. JUSTICE FASCIALE filed a dissent.

58

Russell Forde Hornor,

Plaintiff-Appellant,

v.

Upper Freehold Regional
Board of Education, d/b/a
Upper Freehold Regional
School District, and
Allentown High School,

Defendant-Respondents,

and

New Jersey Future Farmers
of America,

Defendant,

and

Allentown Future Farmers
of America and Charles
Hutler, III,

Defendants.

Ormond Simpkins, Jr.,

Plaintiff-Appellant,
v.

South Orange-Maplewood
School District, Columbia
High School, and Maplewood

Middle School,

Defendants-Respondents,

and

New Jersey Department
of Children and Families,
Division of Child Protection
and Permanency, Family
Connections, Inc., and Nicole
Dufault,

Defendants.

Frankie Jerome,

Plaintiff-Appellant,

v.

South Orange-Maplewood
School District and
Columbia High School,

Defendants-Respondents,

and

Nicole Dufault,

Defendant.

Brandon Hayes,

Plaintiff-Appellant,

v.

2

South Orange-Maplewood
School District, Columbia
High School, and Maplewood
Middle School,

Defendants-Respondents,

and

New Jersey Department
of Children and Families,
Division of Child Protection
and Permanency, Family
Connections, Inc., and Nicole
Dufault,

Defendants.

JUSTICE FASCIALE, dissenting.

It is nearly impossible to imagine a cause more compelling, and a concern more warranting of redress, than that of protecting students from sexual abuse perpetrated by public school employees entrusted with their care and well-being. The challenge in these appeals, which deal solely with public school districts' vicarious liability for willful, wanton, or grossly negligent acts of a sexual nature by their employees, is to articulate workable standards applicable to public school districts for those acts. Meeting that task requires adherence to longstanding principles of statutory interpretation and vicarious

3

liability. I write separately because I disagree with the majority for two reasons.

First, the majority misinterprets the 2019 amendment to the Tort Claims Act (TCA) -- N.J.S.A. 59:2-1.3(a) -- by making public entities vicariously liable for willful, wanton, or grossly negligent acts of a sexual nature committed by their employees outside the scope of their employment. Unlike the majority, I would hold that public school districts may only be vicariously liable for their employees' tortious sexual acts committed <u>within the scope of their employment</u>. The 2019 amendment strips public employees and entities of immunity provided by the TCA, such as N.J.S.A. 59:2-10's immunity for intentional conduct, so that public entities may now be liable for willful, wanton, or grossly negligent sexually abusive acts committed by their employees. But because it does not abrogate the TCA's key "scope of employment" limit on public entity liability -- N.J.S.A. 59:2-2(a) -- that limiting provision remains in effect.

Put together, following the 2019 amendment, a public school district may be vicariously liable only for their employees' willful, wanton, or grossly negligent sexual acts committed <u>within the scope of their employment</u>. The majority's conclusion that N.J.S.A. 59:2-1.3(a) makes public entities vicariously liable for willful, wanton, or grossly negligent acts of a sexual

4

nature committed by their employees <u>outside the scope of their employment</u> is not supported by the plain text of N.J.S.A. 59:2-1.3(a) or its legislative history -- which, in any event, need not be relied upon to interpret this unambiguous provision.  Moreover, such a reading would impose strict liability on public entities, an absurd result the Legislature "clearly did not intend." <u>Ante</u> at ___ (slip op. at 40).

To avoid strict liability, the majority must also conclude that the Legislature additionally intended for this Court to remedy an incomplete statute by crafting novel guardrails on that liability.  The majority's two conclusions are inconsistent:  It is odd to assume that the Legislature intended to create vicarious liability for acts <u>outside</u> the scope of employment but simultaneously intended for this Court to curb that exposure by announcing new limitations on that liability.  That reading obligates the Court to establish atextual guardrails to address the problems created by interpreting N.J.S.A. 59:2-1.3(a) in a way that provides vicarious liability for willful, wanton, or grossly negligent acts of a sexual nature committed by their employees <u>outside the scope of their employment</u>, which highlights my next point of disagreement with the majority.[1]

---

[1]     The majority emphasizes, "[t]o the extent that there is any suggestion" to the contrary, that they have not imposed strict liability as to school districts.

5

Second, resultingly, the majority's "tacit approval" requirement misses the mark. By conflating direct and vicarious liability causes of action, the requirement eschews hornbook principles of vicarious liability. Such a "tacit approval" requirement predicates public entity vicarious liability on a "careful inquiry into the acts and omissions of a" public entity, ante at ___ n.6 (slip op. at 46 n.6), rather than on the acts and omissions of a public entity's employee. These appeals concern only vicarious liability claims. Predicating liability on a public entity's conduct is direct liability, not vicarious liability. The Legislature already provided for such direct liability claims against public entities. See N.J.S.A. 59:2-1.3(a)(2). Moreover, the majority's "tacit approval" requirement is prone to uneven application and avoidance of

---

Ante at ___ n.6 (slip op. at 46 n.6). To avoid any confusion as to my point of disagreement with the majority, my dissenting view is as follows: The majority errs in making two conflicting and unsupported assumptions as to the Legislature's intent. The majority first finds the Legislature intended for the "scope of employment" limit to be disabled in this context, which would necessarily lead to strict liability -- an outcome we both agree would be absurd -- but then finds the Legislature must have also intended that this Court would establish guardrails to remedy such a problematic result.

From this view, it is true by necessity that the limiting standard the majority sets forth today -- created solely to prevent strict liability -- is itself "by no means a strict liability standard." Ante at ___ n.6 (slip op. at 46 n.6). That is undisputed. Again, I write separately because the majority makes conflicting and unsupported assumptions as to the Legislature's intent, among other reasons.

accountability since it incentivizes public entities to escape "vicarious" liability on lack of knowledge grounds.  Ultimately, for future sexual abuse-related vicarious liability claims against public entities <u>beyond</u> the school context, the majority leaves us to wonder what new guardrails it might find the Legislature "intended" for those contexts.[2]  For now, however, schools and other public entities alike are left with insufficient guidance for risk management.[3]

Because I read N.J.S.A. 59:2-1.3(a) and N.J.S.A. 59:2-2(a) together to mean a public school district is vicariously liable only for their employees' tortious sexual acts that are committed <u>within the scope of their employment</u>, the question becomes whether such acts may fall within the scope of employment in this specific context.  To answer that question, I analyze the

---

[2]  The majority's opinion leaves all public entities other than school districts in a quandary.  That is because the majority holds that N.J.S.A. 59:2-1.3(a) abrogates N.J.S.A. 59:2-2(a)'s "scope of employment" liability limitation for sexual abuse claims generally, but only creates guardrails on that liability for school districts.  Therefore, <u>other</u> public entities face vicarious liability for their employees' sexual acts without any limiting standard.  This new liability exposure results in strict liability to those other public entities until the Court announces new guardrails in future cases.

[3]  Not even plaintiff Hornor has the benefit of learning how this brand new standard should operate at the pleadings stage, since the majority opted to remand the <u>Hornor</u> matter to the trial court for disposition of defendant Upper Freehold Board of Education's <u>Rule</u> 4:6-2(e) motion to dismiss Hornor's vicarious liability claim.

7

doctrine of respondeat superior, adhere to N.J.S.A. 59:2-2(a)'s "scope of employment" limitation, and very importantly, propose a context-dependent definition of the judicial concept of respondeat superior that accounts for the unique nature of the employer-employee relationship within the school context while remaining rooted in longstanding common law principles of vicarious liability.[4]

I would therefore hold that a public school employee's willful, wanton, or grossly negligent sexual acts fall within their scope of employment if:

_____

[4] The majority notes that "nothing in the TCA suggests that the scope-of-employment test under N.J.S.A. 59:2-2 should be different in public school employee sexual assault claims from the scope-of-employment standard that governs any other claim." Ante at ___ n.7 (slip op. at 54 n.7). That is correct, though I must clarify that this uncontested proposition is of no consequence to my analysis. The TCA unequivocally "contemplates a symmetry of treatment between government actors and private actors." Maison v. N.J. Transit Corp., 245 N.J. 270, 289 (2021). And in particular, as to N.J.S.A. 59:2-2(a)'s reliance on respondeat superior, the Legislature accomplished that symmetry by invoking the "scope of employment" standard, which was specifically intended to "provide[] a flexible liability provision [that] permit[s] the courts to adapt the principles established in this act to the particular circumstances of the cases coming before them." Task Force, cmt. on N.J.S.A. 59:2-2. For those reasons, I do not define the judicial concept of "scope of employment" distinctly here based on the TCA's text. And it is unclear why I would. Rather, just like in any other respondeat superior inquiry, my analysis of "scope of employment" turns on consideration of the unique employment context at issue, see Davis v. Devereux Found., 209 N.J. 269, 288 (2012), as I later discuss in great detail. Ultimately, the nature and relevance of the TCA's "language and intent" that the majority suggests my analysis "ventures far from" remains a mystery. Ante at ___ n.7 (slip op. at 54 n.7).

8

(1) the employee possessed an official, entity-granted in loco parentis relationship to the victim, by which they were given authority and control over the victim; and (2) the employee engaged in the tortious acts during the exercise of that authority in performing entity-assigned duties, or otherwise engaging in a course of conduct subject to the entity's control.[5] In my view, this holding provides for workable and even application and accounts for the twin aims of tort liability -- fairness and deterrence.

_____

[5] The majority critiques my "scope of employment" standard as "novel" and asserts that the "issue has not been briefed or argued by the parties or amici at any stage." Ante at ___ (slip op. at 54). This criticism is surprising given that the standard the majority adopts is itself both novel and not briefed by the parties. Their standard does not appear in Hardwicke, Lehmann, or any other caselaw, but instead was adapted -- with significant modifications -- from the Attorney General's amicus brief submitted to this Court on appeal. Not only did no party argue for that standard, all parties -- plaintiffs and defendants alike -- expressly argued against the Attorney General's form of it, with plaintiffs specifically contending that adopting such a test would be "procedurally and legally improper" because "no party to this Appeal raised or briefed the issue" and this appeal is "devoid of a factual record that would even permit such an [i]nquiry."

To be sure, I do not "contend[] that the standard adopted here for vicarious liability claims under N.J.S.A. 59:2-1.3 addresses a question 'not briefed by the parties.'" Ante at ___ (slip op. at 54 n.7) (emphasis added). There is no dispute that the question of determining the controlling standard for vicarious liability claims is squarely before this Court. But the standard the majority creates to answer that question -- a standard that is not found in the parties' or amici's briefing, not found in our caselaw, and which has never been articulated before -- cannot be viewed as anything but novel.

9

Applying my holding, the complaint in <u>Hornor v. Upper Freehold Regional Board of Education</u> does not allege sexual acts within the scope of employment. Like the Appellate Division, I agree the trial judge erroneously denied the school district's <u>Rule</u> 4:6-2(e) motion to dismiss Hornor's vicarious liability claims. But the complaints in <u>Simpkins v. South Orange-Maplewood School District</u> allege sexual acts committed within the scope of employment. Unlike the Appellate Division, I would therefore reverse the order that granted the school district's <u>Rule</u> 4:6-2(e) motion to dismiss those vicarious liability claims, though for substantially different reasons than the majority.

I.

Consistent with our longstanding TCA jurisprudence, I agree with the Appellate Division's conclusion in <u>Hornor</u> that the 2019 amendment to the TCA -- N.J.S.A. 59:2-1.3(a) -- does not provide a basis for holding public entities vicariously liable for acts <u>outside</u> the scope of employment. Instead, N.J.S.A. 59:2-1.3(a) strips public entities of TCA-granted <u>immunities</u> that would otherwise absolve them of liability in sexual abuse cases. Because N.J.S.A. 59:2-2(a)'s "scope of employment" limitation is not a TCA-granted immunity, the 2019 amendment does not impact it, and the amendment therefore does not permit public entity vicarious liability for an employee's acts outside the scope of their employment, even in sexual abuse cases.

10

## A.

To understand whether the 2019 amendment expanded the extent of a public entity's vicarious liability, I must first consider the TCA's operation prior to the 2019 amendment.

Before the TCA was enacted, "sovereign immunity had been the general rule in New Jersey," with exceptions carved out in case law. Feinberg v. Dep't of Envtl. Prot., 137 N.J. 126, 133 (1994). In Willis v. Department of Conservation & Economic Development, 55 N.J. 534 (1970), this Court abrogated the doctrine in tort. Two years later, the Legislature responded by "adopting the [TCA] and reestablishing sovereign immunity." Velez v. City of Jersey City, 180 N.J. 284, 289 (2004).

"One purpose of the [TCA] was to avoid the 'somewhat haphazard and even arbitrary' erosion of sovereign immunity in the judicial decisions." Feinberg, 137 N.J. at 134 (quoting S.E.W. Friel Co. v. N.J. Tpk. Auth., 73 N.J. 107, 113 (1977)); accord D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013) ("Far from a broad waiver of sovereign immunity, the [TCA] was the response of the legislative and executive branches to this Court's abrogation of that traditional common law doctrine."). "The [TCA] modifie[d] the doctrine of sovereign immunity and create[d] limited situations in which

11

parties may assert tort claims against public entities." Id. at 133; accord

O'Donnell v. N.J. Tpk. Auth., 236 N.J. 335, 344-45 (2019).

Under the TCA, sovereign immunity exists unless "there is a statutory

declaration of liability." Bell v. Bell, 83 N.J. 417, 423 (1980); N.J.S.A. 59:2-

1(a) ("Except as otherwise provided by this act, a public entity is not liable for

an injury, whether such injury arises out of an act or omission of the public

entity or a public employee or any other person."). Within this framework, the

statutory provisions declaring the bounds of liability function as the "clear and

unequivocal" legislative waivers that would be required at common law to

abrogate sovereign immunity in tort. See Royster v. State Police, 227 N.J.

482, 494 (2017) (quoting Allen v. Fauver, 167 N.J. 69, 77 (2001)). Because in

passing the TCA the Legislature "made clear that its waiver of sovereign

immunity was strictly limited by the terms of the statute itself," its liability

provisions are "not subject to expansion by case law." Maison v. N.J. Transit

Corp., 245 N.J. 270, 310 (2021) (Patterson, J., concurring in part and

dissenting in part).

N.J.S.A. 59:2-2(a) is one such provision, and it is the "primary source of

public entity liability." Att'y Gen.'s Task Force on Sovereign Immunity,

Report, cmt. on N.J.S.A. 59:2-2 (1972). That provision provides that "[a]

public entity is liable for injury proximately caused by an act or omission of a

12

public employee <u>within the scope of his employment</u> in the same manner and to the same extent as a private individual under like circumstances."  N.J.S.A. 59:2-2(a) (emphasis added).  Because the provision waives immunity as to acts <u>within</u> the scope of employment, the TCA does not permit plaintiffs to hold public entities vicariously liable for employee acts <u>outside</u> the scope of employment.  In other words, N.J.S.A. 59:2-2(a) serves as a key limitation on the extent of public entity liability.

Beyond the wholesale assertion of sovereign immunity and the limited waiver of that immunity for acts within the scope of employment, the TCA contains specific provisions that wholly <u>exempt</u> a public entity from liability it would otherwise face for acts within the scope of employment.  <u>See</u> N.J.S.A. 59:2-1(b) ("Any liability of a public entity established by this act is subject to any immunity of the public entity . . . ."); <u>see also</u> <u>Tice v. Cramer</u>, 133 N.J. 347, 356 (1993) ("When both liability and immunity appear to exist, the latter trumps the former.").

One of the immunity provisions is N.J.S.A. 59:2-10, which immunizes public entities from liability "for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." Because of N.J.S.A. 59:2-10, even if a public employee's sexual abuse fell within the scope of their employment -- and therefore within the limitations

imposed by N.J.S.A. 59:2-2(a) -- the public entity would nonetheless be immunized so long as that sexual abuse amounted to "a crime" or "willful misconduct." Thus, prior to the 2019 amendment, public entities could never be vicariously liable for sexual misconduct -- even if committed within the scope of employment -- because N.J.S.A. 59:2-10 immunized public entities from liability "for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." See Margolis & Novack, Title 59: Claims Against Public Entities, cmt. 1 on N.J.S.A. 59:2-10 (2025) ("This section establishes a basis for employer immunity once a ground is established for the employer's vicarious liability under 59:2-2(a)." (emphasis added)).

B.

In 2019, as part of the Child Victims Act (CVA), the Legislature amended the TCA, adding N.J.S.A. 59:2-1.3 to the Act. See L. 2019, c. 120, § 7. Subsection (a)(1) of that statute reads:

> Notwithstanding any provision of the [TCA] to the contrary:
>
> > (1) immunity from civil liability granted by that act to a public entity or public employee shall not apply to an action at law for damages as a result of a sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in [N.J.S.A. 2A:30B-2], or sexual abuse as defined in [N.J.S.A. 2A:61B-1] being committed against

14

> a person, which was caused by a willful, wanton, or grossly negligent act of the public entity or public employee[.]

[N.J.S.A. 59:2-1.3(a)(1) (emphases added).]

The effect of N.J.S.A. 59:2-1.3(a) on the immunity granted in N.J.S.A. 59:2-10 is evident:  Because N.J.S.A. 59:2-10 would have immunized public entities from liability for an employee's willful misconduct within the scope of their employment, so long as that sexual abuse was willful, that grant of immunity "is disabled in [sexual abuse cases] by N.J.S.A. 59:2-1.3(a)(1)." E.C. by D.C. v. Inglima-Donaldson, 470 N.J. Super. 41, 56 (App. Div. 2021). Accordingly, the 2019 amendment expanded public entity liability because a public entity may now be vicariously liable for willful, wanton, or grossly negligent sexual acts committed by its employees within the scope of their employment.

The majority and I disagree as to whether the 2019 provision also impacts the "scope of employment" limit established in N.J.S.A. 59:2-2(a). The majority's analysis begins and ends with Hardwicke v. American Boychair School, 188 N.J. 69 (2006), a Charitable Immunity Act case referenced in the CVA's legislative history.  For this reason, the majority finds that because N.J.S.A. 59:2-1.3(a) disables the TCA's "general immunity" at N.J.S.A. 59:2-1(a), adherence to the TCA's clear boundaries on the scope of public entity

15

liability has become "unnecessary" in this context. Ante at ___ (slip op. at 38). Practically speaking, this infinitely expands N.J.S.A. 59:2-2(a), a carefully defined liability provision. That critical "scope of employment" limit is not surplusage, and should not be discarded by inference. I do not view the 2019 provision to support such a reading, neither by its plain text nor by its legislative history.

1.

To interpret a statute, "we look to the Legislature's intent as expressed in the statute's plain terms." Wiggins v. Hackensack Meridian Health, 259 N.J. 562, 574 (2025). "We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted). "If the language is clear, the court's job is complete." In re DiGuglielmo, 252 N.J. 350, 360 (2022) (quoting In re Expungement Application of D.J.B., 216 N.J. 433, 440 (2014)). "Only if the statutory language is ambiguous do courts look beyond it to extrinsic evidence, such as legislative history, for guidance." In re Plan for Abolition of Council on Affordable Hous., 214 N.J. 444, 468 (2013).

2.

It must be reiterated that the TCA statutorily "reestablishes sovereign immunity for public entities," Chatman v. Hall, 128 N.J. 394, 402 (1992), by imposing a statutory scheme that functions as a reimposed version of the common law doctrine from which it arose, a doctrine which itself requires a "clear and unequivocal" expression of legislative intent to override, see Borough of Englewood Cliffs v. Trautner, 260 N.J. 410, 428 (2025) (quoting Royster, 277 N.J. at 494)). Against this unique statutory backdrop, I am hesitant to take a provision that makes no reference to vicarious liability nor any express indication of what it intended to disable and assume -- based largely on contestable inferences from a vague legislative record -- that the Legislature really intended to impose expansive and potentially limitless vicarious liability on public entities.

Rather, to determine whether the Legislature intended for this amendment to abrogate the TCA's "scope of employment" limitation, my analysis begins with the plain text of the provision. DiProspero, 183 N.J. at 492 ("[T]he best indicator of that intent is the statutory language."). From this view, I believe the terms "immunity" and "shall not apply" as used in N.J.S.A. 59:2-1.3(a)(1) can be understood to do no such thing, so long as we "ascribe to the statutory words their ordinary meaning" and "read them in context with

17

related provisions so as to give sense to the legislation as a whole." Ibid. (emphases added).

First, N.J.S.A. 59:2-1.3(a) clearly does not provide a predicate for holding entities liable for employee acts committed outside their scope of employment: It does not, by its plain terms, expressly create a new basis for public entity liability. And second, to understand what it does do, I would "proceed by assuming the phrase 'immunity from civil liability' was intended by the Legislature to mean exactly what it suggests: an 'exemption from a duty or liability.'" E.C. by D.C., 470 N.J. Super. at 54 (emphases added) (quoting Black's Law Dictionary 898 (11th ed. 2019)). "This view comports not only with common usage and dictionary definitions but also with how the word 'immunity' has been historically understood by courts." Ibid. (citing McDonald v. City of Chicago, 561 U.S. 742, 813-15 (2010) (Thomas, J., concurring in part) (explaining that, historically, immunity is defined as "freedom from an obligation")).

Accordingly, by the amendment's plain terms, N.J.S.A. 59:2-1.3(a) disables any TCA-provided exemptions from liability that may apply to sexual abuse claims; it in no way indicates that the Legislature intended that all other TCA provisions, such as preexisting limitations on liability, must be disregarded. A limitation on liability is, by definition, not an immunity from

18

liability because a "limitation" is not a wholesale exemption; rather, a limit is "something that bounds, restrains, or confines." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/limits; see also E.C. by D.C., 470 N.J. Super. at 54 ("[A]n immunity is an exemption from liability, and not a limitation of liability . . . .").

N.J.S.A. 59:2-2(a)'s text clearly frames "scope of employment" as a boundary or guardrail on vicarious liability, rather than as an "absolution" or "exemption" from liability intended to explicitly immunize entities from certain claims. It reads: "A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2-2(a) (emphasis added). In other words, the Legislature invoked respondeat superior to demarcate the "within" parameters of liability, not to wholly absolve public entities from liability in a particular circumstance. Accordingly, the 2019 amendment does not provide a sufficiently clear textual basis to assume the Legislature intended to abrogate this essential, longstanding constraint on public entity vicarious liability.

If the Legislature had a contrary intent in passing the 2019 amendment, it is clearly capable of expressly removing TCA-imposed limitations by amendment, as evidenced by the Legislature's actions in this very statute. For

19

example, in 2025, the Legislature amended N.J.S.A. 59:2-1.3 to expressly disable in sexual abuse cases a TCA-imposed damages limitation. The TCA limits the recovery of damages against public entities and public employers for injuries to exclude those resulting in pain and suffering. See N.J.S.A. 59:9-2(d). That limitation was not altered by the 2019 amendment. To remove that limitation in sexual abuse cases, the Legislature subsequently amended N.J.S.A. 59:2-1.3 to expressly state that: "The recovery limits set forth under subparagraph (a) of paragraph (2) of subsection d. of [N.J.S.A. 59:9-2] shall not apply to an action at law filed pursuant to this section." N.J.S.A. 59:2-1.3(c) (emphases added). The Legislature's explicit addition of this text supports that it did not intend for N.J.S.A. 59:2-1.3(a) to implicitly bypass all TCA-imposed limitations in the sexual abuse context.

Further, it is true that "[i]n construing statutes, the use of . . . a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." Kennedy v. Weichert Co., 257 N.J. 290, 310 (2024) (alteration in original) (quoting Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993)). But N.J.S.A. 59:2-1.3's "notwithstanding" clause does not mean that this Court must construe the provision's terms in a manner that forces a conflict with as many provisions as possible. Properly read, the inclusion of

20

"notwithstanding" allows N.J.S.A. 59:2-1.3(a) to supersede and disable any and all otherwise-applicable TCA-granted immunities; it does not apply to limitations established within the Act.

3.

Any contrary reading forces an unwarranted, supra-textual interpretive conflict between N.J.S.A. 59:2-1.3(a) and N.J.S.A. 59:2-2(a).  In finding that N.J.S.A. 59:2-1.3(a) disables the TCA's "general immunity," the majority holds that the Act's liability provisions -- like N.J.S.A. 59:2-2(a) -- must become superfluous and dispensable in this context.  N.J.S.A. 59:2-2(a) was not intended merely to provide plaintiffs with a predicate for liability, but also to provide clear, unequivocal, and meaningful boundaries on the scope of a defendant's liability.  Concluding otherwise overly broadens the scope of disabled TCA provisions in this context far beyond the plain meaning of the word "immunity."

Such a finding also conflicts with our typical TCA interpretive principles.  Those principles instruct that the TCA's overall language is "unmistakably clear in providing that liability on the part of the State cannot be imposed unless consistent with the entire Act itself."  Kolitch v. Lindedahl, 100 N.J. 485, 492 (1985) (emphasis added); see also DiProspero, 183 N.J. at 498 ("We will not labor . . . to find a conflict between the Legislature's

21

findings and declarations in [the statute's preamble] and the text of [the statute].").  In particular, upon passing the TCA, the Legislature "declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act," and that "[a]ll of the provisions of [the TCA] should be construed with a view to carry out [this] legislative declaration."  N.J.S.A. 59:1-2 (emphases added).  To this end, the better we interpret the plain meaning of the TCA's provisions to operate harmoniously, in concert with one another, the closer we are to the Legislature's true intent.

Crucially, forcing a conflict between N.J.S.A. 59:2-1.3(a) and N.J.S.A. 59:2-2(a) requires making two conflicting assumptions as to the Legislature's intent.  First, the majority states that "[t]he Legislature's identification of Hardwicke as a model for the standard governing claims under N.J.S.A. 59:2-1.3(a) underscores its intent" to abrogate N.J.S.A. 59:2-2(a)'s "scope of employment" limit in this context, because otherwise, "the standards governing public employees and the standards governing charitable entities under Hardwicke could not be reconciled."  Ante at ___ (slip op. at 52).  But second, because the resulting strict liability would lead to an unworkable outcome that the Legislature "clearly did not intend," ante at ___ (slip op. at 40), the majority concludes the Legislature also intended courts would fix this

22

outcome by imposing vicarious liability on public entities subject to some unknown, unspecified limiting parameters. This is especially so since Hardwicke provides no such standard that can be "reconciled" in this context.

Put together, the majority's holding requires assuming not only that the Legislature intended to disable the "scope of employment" limit -- despite the statute's plain text -- but also that the Legislature intended for courts to remedy the inevitable, absurd result of such an interpretation by creating novel, atextual guardrails that fix its incomplete statute. As a general rule, this Court avoids interpreting "a statute in a way that 'leads to an absurd result.'" State v. Williams, 218 N.J. 576, 586 (2014) (quoting DiProspero, 183 N.J. at 493). I would decline to do so here.

4.

Because the text of the statute is clear, I would end my inquiry there and would not resort to legislative history to interpret the statutory language. But even considering the legislative history, it does not provide a basis for extending vicarious liability outside the scope of employment. The legislative history does not make any reference to vicarious liability, and any additional clarity provided by the Legislature's reference to entity liability or harmonizing charitable and public entity liability supports a reading consistent with this dissent.

23

Throughout the enactment of the CVA, which included the TCA amendment that is the subject of this appeal, the Legislature made clear that its primary purpose was to extend the statute of limitations and the recovery window for sexual abuse claims and to "codify the liability of public entities." See Sponsor's Statement to S. 477 7.  The first version of the CVA failed to include a liability standard for sexually abusive acts.  Governor's Statement on Signing S. Comm. Sub. for S. 477 (May 13, 2019) (Governor's Signing Statement); L. 2019, c. 120, § 7.  The Legislature subsequently amended the statute to specify a liability standard of "willful, wanton or grossly negligent." L. 2019, c. 239 (codified at N.J.S.A. 59:2-1.3(a)).  Neither version of the statute addresses vicarious liability.

The Sponsor's Statement makes clear that the intent regarding public entity liability was to establish liability standards "identical to the liability standards applied to non-profit organizations . . . .  Thus, a public entity or public employee could be held liable for willful, wanton or grossly negligent acts resulting in a 'sexual assault.'"  Sponsor's Statement to A. 5392 2-3 (May 13, 2019).  Of note for interpretive purposes, the Sponsor's Statement carries limited weight due to the existence of multiple versions of the bill.  See State v. State Supervisory Emps. Ass'n, 78 N.J. 54, 69-70 (1978) (noting that a Sponsor's Statement for a statute that is "changed several times prior to

24

passage" is "a less than definitive guide to the intended effect of the amendment of that section as it finally emerged"). Any guidance provided by the Sponsor's Statement clarifies only the Legislature's intent to impose liability for willful, wanton, or grossly negligent acts of sexual abuse and provides no clarity on legislative intent regarding vicarious liability.

This liability standard is exactly why the Legislature referenced Hardwicke: In considering charitable immunity under the Charitable Immunity Act (CIA), this Court held in Hardwicke that charitable entities had immunity only for "simple negligence" and not for other forms of tortious conduct, so the CIA did not immunize "willful, wanton or grossly negligent conduct." 188 N.J. at 97, 99. Charitable entities thus could be vicariously liable for common law claims based on such acts committed by their employees. Id. at 102.

Hardwicke is not instructive beyond this standard. The central question in Hardwicke was whether a boarding school was a "person" standing in loco parentis and therefore qualified as a "passive abuser" within the meaning of the Child Sexual Abuse Act. Id. at 87. Hardwicke had nothing to do with the TCA. Common law vicarious liability for acts outside the scope of employment was only briefly noted in that opinion because the CIA did not statutorily "bar Hardwicke's claims for intentional conduct." Id. at 102. The

CIA does not have a "scope of employment" limitation. The TCA is a distinct statute, and we cannot be wholly blind to that difference merely because the Legislature referenced Hardwicke.

The legislative reference to Hardwicke illustrates only an intent to apply its articulated liability standard -- that entities may be liable for "willful, wanton or grossly negligent acts resulting in abuse." S. Judiciary Comm. Statement to S. Comm. Sub. for S. 477 2 (Mar. 7, 2019) (Judiciary Comm. Statement). That is precisely what the Legislature achieved: Following the 2019 amendment, public entities may now be vicariously liable for acts of sexual abuse that are committed willfully, wantonly, or grossly negligently -- acts that previously were immunized under N.J.S.A. 59:2-10. Accordingly, following the 2019 amendment, both charitable and public entities are "held to the same standard of liability," Governor's Signing Statement, a standard that permits liability for sexual abuse committed willfully, wantonly, or grossly negligently. But nothing -- nothing in the text of the amendment, nothing in its legislative history, and nothing in the text of the TCA elsewhere -- provides a basis for finding liability for such acts outside the scope of employment.

Reading intent to render public entities liable for employee sexual abuse outside the scope of employment leads to the implausible conclusion that the Legislature intended to impose strict liability on public entities for public

26

employees' sexual assaults. That inference is unwarranted: Assuming the Legislature intended to do away with the respondeat superior principles of agency law embodied in N.J.S.A. 59:2-2(a) requires assuming the Legislature intended to negate N.J.S.A. 59:9-2(b), a key TCA provision that plainly states "[n]o judgment shall be granted against a public entity or public employee on the basis of strict liability."

The Senate Judiciary Committee's statement to the 2019 amendment contradicts the assumption that the Legislature intended to impose strict liability. It clarifies that the Legislature passed the 2019 amendment so that "a public entity, as defined in the [TCA], may be held liable [in sexual abuse suits] in the same manner as a private organization." Judiciary Comm. Statement 4. Private entities are not subject to strict liability for employees' sexual abuse outside the scope of employment. See Maison, 245 N.J. at 289 ("The TCA, . . . in the absence of an applicable immunity, generally contemplates a symmetry of treatment between government actors and private actors."). Thus, I cannot infer the Legislature clearly intended to impose this new obligation on public entities. Had the Legislature intended for such an extraordinary result, it would have expressly said so.

5.

The majority agrees that, absent guardrails, allowing for vicarious liability outside the scope of employment would result in strict liability on public entities. To avoid that result, the majority finds -- without any textual basis -- that the Legislature "envisioned a fact-specific analysis of school officials' acts and omissions as they relate to a school employee's sexual abuse of a student." Ante at ___ (slip op. at 42). The majority concludes that the standard it articulates "comport[s] with the Legislature's intent as reflected in the statutory text and legislative history of the Child Victims Act." Ante at ___ (slip op. at 55). But the test the majority crafts is not found in the statutory text, its legislative history, or in Hardwicke, and although the test is purportedly derived from Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587 (1993), it is a significant departure from that standard, consisting of new elements and considerations. I cannot conclude the Legislature intended a test so removed from the statutory text, legislative history, and applicable caselaw.

Moreover, the "tacit approval" requirement, focused on "the knowledge and culpability of school officials and other school employees in a position to prevent or stop the abuse," ante at ___ (slip op. at 45), is at odds with both principles of agency law and the purpose of the CVA. Under this standard, public entities might escape liability by claiming lack of knowledge. See

28

Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 300-01 (Stevens, J., dissenting) ("As long as school boards can insulate themselves from knowledge about [sexually abusive] conduct, they can claim immunity from damages liability."). Such a result fails to "impose[] responsibility on those in the best position to know of the abuse and stop it," Hardwicke, 188 N.J. at 102, and fails to effectuate the Legislature's goals of deterring sexual abuse and compensating victims for abuse that occurs, see Governor's Signing Statement. It could also lead to a result where a public entity is not liable, even if a school employee had knowledge of sexual abuse, because the employee is not "in a position to prevent or stop the abuse." Ante at ___ (slip op. at 45); see also Gebser, 524 U.S. at 301.

Critically, the majority's test, although framed as a form of vicarious liability, is in effect a new direct liability cause of action. Direct and vicarious liability claims are fundamentally distinct; the former imposes liability based on "direct fault" while the latter "imposes . . . liability, without 'personal fault,' upon employers for certain acts of an employee." G.A.-H. v. K.G.G., 238 N.J. 401, 415-16 (2019). An inquiry "focuse[d] . . . on the knowledge and culpability of school officials," ante at ___ (slip op. at 45), is an inquiry focused on employer fault, i.e., direct liability. The Legislature has already provided for direct liability against public entities. N.J.S.A. 59:2-1.3(a)(2)

(negligent hiring, supervision, or retention). Those claims all focus on the employer's knowledge and degree of fault in causing plaintiffs' harm. See G.A.-H., 238 N.J. at 416. I cannot conclude that the Legislature intended for this Court to impose a new direct liability standard, untethered to the statutory text and independent from our well-recognized direct liability claims against employers.

In the absence of an express statutory grant of liability outside the scope of employment, the majority attempts to create one, grounded in extrinsic sources. But this attempt results in an unharmonious reading of the TCA, distorts the legislative history, and leads to a result the Legislature neither articulated nor intended. It is more reasonable to conclude that the Legislature intended the "scope of employment" limit to be the guardrail on public entity liability -- a guardrail that is expressly provided for in the text of the TCA.

C.

In sum, there is no clear basis to assume the Legislature intended by the 2019 amendment to set aside in the sexual abuse context all otherwise-applicable provisions within the TCA. Thus, because the text and legislative history surrounding N.J.S.A. 59:2-1.3(a) do not indicate the Legislature intended to bypass N.J.S.A. 59:2-2(a)'s "scope of employment" boundary in

30

this context, that provision remains operative, and continues to restrict public entity vicarious liability for employee acts <u>outside</u> the scope of employment.

It is true that "N.J.S.A. 59:2-1.3(a) could have been drawn with greater precision." <u>E.C. by D.C.</u>, 470 N.J. Super. at 56. But "[t]he Legislature's waiver of sovereign immunity remains a limited one and we are not free to expand that waiver beyond its statutorily established boundaries. Nor can we permit sympathy for a particular plaintiff to obscure the statutory standard to the point of obliterating it." <u>Univ. of Med. & Dentistry of N.J.</u>, 213 N.J. at 157-58 (rejecting an "unlimited and unbounded approach" to TCA liability that would not be "consistent with the Act's limited waiver of sovereign immunity and our usual strict construction of its requirements").

Rather, I would "take comfort in the knowledge that if we have misconstrued its intent, the Legislature has the power to clarify its intent by amendatory enactments." <u>E.C. by D.C.</u>, 470 N.J. Super. at 56; <u>see also</u> Task Force, cmt. on N.J.S.A. 59:2-1 ("Should further study in future years demonstrate that additional liability of public entities is justified, such liability may then be imposed by the Legislature within carefully drafted limits."). For now, however, I would hold that the TCA does not authorize public entity vicarious liability for employee acts committed <u>outside</u> the scope of employment.

Concluding that public schools are only vicariously liable for employee acts committed within the scope of employment does not end the inquiry. Although the Court must respect both the Legislature's intent behind the Tort Claims Act and the intricate structure it established therein, defining judicially created, common law phrases and standards is well within the judiciary's purview. See Task Force, cmt. on N.J.S.A. 59:2-2 ("[T]his section provides a flexible liability provision which will permit courts to adapt the principles established in this act to the particular circumstances of the cases coming before them."). To that end, because N.J.S.A. 59:2-2(a) remains in effect and limits public entity vicarious liability to injuries caused by an employee's acts within the scope of their employment, the operative question becomes whether an employee's sexually abusive acts fall within an employee's "scope of employment" in this context.

As an initial matter, the majority notes that the meaning of "scope of employment" in this context has "not been briefed or argued by the parties or amici at any stage." Ante at ___ (slip op. at 54). It must be reiterated that the issue on appeal is whether plaintiffs adequately pled vicarious liability claims against public entities. In litigating that issue, the discrete terms "scope of employment" and "respondeat superior" appear no less than 530 times

32

throughout the merits briefs submitted in this case. Because resolution of the present issue requires understanding what those common law, judicially created terms mean in this context, I disagree with the notion that this Court need not define them as applied to the matters before us.

Indeed, defining those terms can only be done in light of recent developments identified by the parties and amici in this matter. Prior to oral argument, plaintiff Hornor advised this Court that the American Law Institute (ALI) recently adopted a "Special Rule on Vicarious Liability for Sexual Assault" as part of the Restatement (Third) of Torts.[6] The ALI's "Special Rule," discussed more fully below, expands employer vicarious liability for employee sexual assault of particularly vulnerable victims. The rule functions as a miscellaneous exception to the ALI's respondeat superior standard. The ALI adopted this new rule in recognition of the fact that courts across the country, for decades, have struggled to create fair, workable standards for entity vicarious liability in the difficult sex-abuse context.

In another, earlier development, the ALI abandoned the aided-by-agency theory upon which the majority relies. Restatement (Third) of Agency § 7.08

---

[6] In addition, the Attorney General, amicus curiae, noted in his brief that this Court may wish to consider adoption of the Restatement (Third)'s approach to vicarious liability within the sexual-assault context in an appropriate case.

33

cmt. b (Am. L. Inst. 2006) ("This Restatement does not include 'aided in accomplishing' as a distinct basis for an employer's (or principal's) vicarious liability."); see also Pearce v. Werner Enters., Inc., 116 F. Supp. 3d 948, 957 (D. Neb. 2015) ("Section 219(2)(d) has proven contentious and difficult to apply, and has been disavowed by its creators.").[7]

Those developments underscore that vicarious liability and respondeat superior are uniquely challenging concepts to apply in the sexual abuse context and therefore demand a particularly careful, context-sensitive review, especially in the in loco parentis setting. Upon this review, I would hold that a public school employee's willful, wanton, or grossly negligent sexual acts fall within the scope of their employment if: (1) the employee possessed an official, entity-granted in loco parentis relationship to the victim, by which they were given authority and control over the victim; and (2) the employee engaged in the tortious acts during the exercise of that authority in performing entity-assigned duties, or otherwise engaging in a course of conduct subject to the entity's control.

---

[7] It is debatable if the aided-by-agency theory is still recognized in the Restatement (Second) of Agency as, in 2023, the ALI added the following disclaimer to § 219: "The second part of § 219(2)(3), regarding the "aided-by-agency" theory of vicarious liability, was not approved by the ALI membership and thus did not represent the position of the ALI. It has since been superseded by the Restatement of the Law Third, Agency."

To arrive at that holding, I (A) examine the historical backdrop of the "scope of employment" standard and the context-specific evolution of vicarious liability in contemporary jurisprudence and scholarship; (B) reflect on the jurisprudential goals underlying application of respondeat superior; and (C) consider the particular, unique nature of the employment relationship in the school setting.

A.

My analysis begins with a review of the origins and evolution of respondeat superior in our jurisprudence as well as in comparative jurisdictions. "Although as a general rule of tort law, liability must be based on personal fault, the doctrine of respondeat superior recognizes a vicarious liability principle pursuant to which a master will be held liable in certain cases for the wrongful acts of his servants or employees." Carter v. Reynolds, 175 N.J. 402, 408 (2003) (citing Prosser & Keeton on Torts §§ 4, 69 (5th ed. 1984)). Under the doctrine of respondeat superior, "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Restatement (Second) of Agency § 219 (Am. L. Inst. 1958).

"The doctrine of respondeat superior ('let the superior make answer') originated in the seventeenth-century common law of England, based upon the

concept 'that one who would manage his or her affairs through others is obligated to third persons damaged by such others acting in the course of their employment." Davis v. Devereux Found., 209 N.J. 269, 287 (2012) (citation omitted) (quoting 1 J.D. Lee & Barry A. Lindahl, Modern Tort Law:  Liability and Litigation § 7.2 (2000)).  The "scope of employment" inquiry "thus focuses the Court on the relationship between the employee's job responsibilities and his or her tortious conduct."  Ibid.

The nature of the employment relationship, however, varies greatly depending on context.  That cannot be overemphasized.  This variance has inherently made imposing a universal "scope of employment" test difficult.  For decades, we have acknowledged that although "'[s]cope of employment' is a commonly cited principle," its meaning is "concededly imprecise" and its application highly fact-specific.  Carter, 175 N.J. at 411 ("This highly indefinite phrase . . . is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions." (quoting Prosser on Torts § 70)); accord Di Cosala v. Kay, 91 N.J. 159, 169 (1982); Davis, 209 N.J. at 302.

In an effort for clarity, notwithstanding the difficulties posed by evolving historical and economic considerations, "the courts of today have worked out tests which are helpful in predicting whether there is such a

36

relation between the parties that liability will be imposed upon the employer for the employee's conduct within the scope of employment." Restatement (Second) of Agency § 219 cmt. a. Those judicially created tests present both useful guidance and notable shortcomings in determining when liability attaches. To adequately present the challenges unique to applying respondeat superior in the present context, I will review (1) the typical "purpose-to-serve" standard for "scope of employment" that most jurisdictions, including New Jersey, have adopted; (2) alternative foreseeability-based approaches to "scope of employment"; (3) additional approaches to vicarious liability proposed in scholarship and adopted by other common law jurisdictions; and (4) approaches to vicarious liability for acts outside the scope of employment proposed by the ALI.

1.

Like most jurisdictions, this Court has adopted the Restatement (Second) of Agency's approach to "scope of employment" whereby "[c]onduct is generally considered to be within the scope of employment if, '[(a)] it is one of the kind [that the servant] is employed to perform; [(b)] it occurs substantially within the authorized time and space limits; [and] [(c)] it is actuated, at least in part, by a purpose to serve the master.'" Di Cosala, 91 N.J. at 169 (third and fifth alterations in original) (emphasis added) (quoting Restatement (Second)

37

of Agency § 228).  The "most important part of this test" is part (c), the "requirement that there be a 'purpose to serve' the master."  See Paula J. Dalley, All in a Day's Work:  Employers' Vicarious Liability for Sexual Harassment, 104 W. Va. L. Rev. 517, 545 (2002) (collecting cases).

In Davis v. Devereux Foundation, we observed how this requirement operates in practice:  "When the employee's conduct -- however aggressive and misguided -- originated in [the employee's] effort to fulfill an assigned task, the act has been held to be within the scope of employment."  209 N.J. at 303 (emphasis added) (reviewing cases).  This requirement maps quite well onto the traditional context where the employer-employee relationship is fundamentally commercial in nature:  Because the purpose of the relationship is to profit the employer, it seems fair to establish as a guardrail that when an employee's conduct cannot, even in the slightest way, be understood to benefit the employer's interests, and thereby further the purpose of that relationship, it must be outside the scope of employment.

But the limitation of this standard becomes apparent in the sexual assault context.  This "purpose-to-serve" standard virtually always excludes an employee's sexual misconduct because such conduct cannot be thought, in any way, to further an employer's interests.  See id. at 305-06; see, e.g., Cosgrove v. Lawrence, 215 N.J. Super. 561, 563 n.1 (App. Div. 1987) (explaining that a

38

social worker therapist's sexual abuse of a patient could only fall within the scope of employment "upon a showing that sexual relations met prevailing professional standards as an acceptable method of therapy and that the employee therapist intended them to combat depression"); Piedmont Hosp., Inc. v. Palladino, 580 S.E.2d 215, 218-19 (Ga. 2003) ("While [the defendant's] employment did authorize him to inspect and clean the incision in [the plaintiff's] groin, in no way did it permit him to sexually manipulate [the plaintiff's] genitals. . . . [T]here can be no serious argument that [the defendant's] alleged manipulation of [the plaintiff's] genitals furthered Piedmont Hospital's business," and the abuse was therefore "obviously and irrefutably outside the scope of his employment"); Buck v. Blum, 130 S.W.3d 285, 290-91 (Tex. App. 2004) ("[The plaintiff] pleaded that during a neurological examination, [the defendant] placed his penis in her hand instead of using the metal weight he had used previously. . . . While it is undisputed [the defendant's] alleged action was inappropriate, it cannot be fathomed that the action was in furtherance of the employer's business or for the accomplishment of an object for which he was employed. At the very moment [the defendant] placed his body part in her hand (assuming he did), he was acting in his own prurient interest and ceased to be acting for the employer. The neurological examination at that point was only a pretense or a means for

39

[the defendant's] inappropriate personal gratification . . . and thus, [the defendant's] employers cannot be held liable under respondeat superior." (emphasis added) (citation omitted)).

By arbitrarily excluding conduct that is not considered to serve the employer's interest, this test leaves a notable gap in recovery for victims who were harmed by a misuse of employer-granted authority. This gap is most apparent in the school or law enforcement context where the authority employers confer on employees and the trust individuals place in those employees renders those individuals particularly vulnerable to abuse. For example, in J.H. ex rel. D.H. v. West Valley City, the Supreme Court of Utah held that a city was not liable for sexual abuse committed by a police officer that occurred during a city-sanctioned youth outreach program. 840 P.2d 115, 122-23 (Utah 1992). Even though the officer was undisputedly entrusted with the care and supervision of the youth, and the abuse occurred in the officer's patrol car, the court reasoned that the city could not be liable because the officer committed the molestation "for his own personal gratification," such that "[the city] received no benefit from the acts, and [the defendant] did not intend [the city] to benefit from his acts." Id. at 123.

The perfunctory outcomes produced by the "purpose-to-serve" approach in sex-abuse cases like those above illustrate the rigidity of this test -- a

40

rigidity that undermines the intended flexible, fact-specific application of respondeat superior and fails to protect particularly vulnerable victims. The approach's inflexibility reflects what jurists have long recognized as the "inadequacy of the motive test." See Ira S. Bushey & Sons, Inc. v. United States, 398 F.2d 167, 170 (2d Cir. 1968) (noting the "highly artificial way in which the motive test has been applied"); see also Lange v. Nat'l Biscuit Co., 211 N.W.2d 783, 785 (Minn. 1973) ("We reject as the basis for imposing [vicarious] liability the arbitrary determination of when, and at what point, the argument and assault leave the sphere of the employer's business and become motivated by personal animosity.").

2.

The Second Circuit's eminent decision in Ira S. Bushey & Sons remains a leading example of respondeat superior and a foreseeability-based approach to "scope of employment." In that case, the court imposed vicarious liability on the Government for property damage caused by its employee -- a sailor who, following a night of drinking, opened valves and flooded the drydock, thereby damaging both the drydock and the ship. 398 F.2d at 168. Although the court observed that the sailor's actions bore no relation to any intent to further the employer's interests, it nevertheless found the sailor's conduct was within the scope of his employment because it was "not so 'unforeseeable' as

41

to make it <u>unfair</u> to charge the Government with responsibility," even though the sailor's "prior record was unblemished." <u>Id.</u> at 169-71 (emphases added).

As with the Second Circuit's rationale in <u>Bushey</u>, jurisdictions that have adopted alternate approaches to the "purpose-to-serve" standard for "scope of employment" tend to root their definition in principles of fairness and foreseeability. Those jurisdictions generally center their inquiry on "whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer." <u>Rodgers v. Kemper Constr. Co.</u>, 124 Cal. Rptr. 143, 149 (Ct. App. 1975) (quoting 2 Fowler V. Harper & Fleming James, Jr., <u>The Law of Torts</u> 1376 (1956), and citing <u>Bushey</u>); <u>see also</u> <u>Leafgreen v. Am. Family Mut. Ins. Co.</u>, 393 N.W.2d 275, 280-81 (S.D. 1986) (citing <u>Rodgers</u>); <u>Samuels v. S. Baptist Hosp.</u>, 594 So. 2d 571, 574 (La. Ct. App. 1992); <u>Cox v. Evansville Police Dep't</u>, 107 N.E.3d 453, 461-63 (Ind. 2018) (explaining that Indiana's "scope of employment" rule "extends beyond authorized acts" and that "an employer is liable for employees' tortious acts that arise naturally or predictably from the employment context").

A foreseeability-based approach to "scope of employment" is broader in application than a "purpose-to-serve" approach and therefore may more readily include sexual misconduct. <u>See, e.g.</u>, <u>Stropes by Taylor v. Heritage House</u>

42

Childs. Ctr. of Shelbyville, Inc., 547 N.E.2d 244, 249 (Ind. 1989) (finding sexual assault "not per se determinative of the scope of employment question"). For sexual misconduct to be fairly foreseeable, however, courts adopting this approach tend to implicitly require that the nature of the employment relationship at issue involves a special relationship between the employer and the victim. For example, in Fahrendorff ex rel. Fahrendorff v. North Homes, Inc., the Supreme Court of Minnesota found that a jury could find a group home vicariously liable after a program counselor sexually abused a minor temporarily residing in the home. 597 N.W.2d 905, 907 (Minn. 1999). In determining whether the assault was foreseeable, the court focused on the fact that "[the program counselor] held significant power and authority over [the child]," noting that "[the program counselor's] job enabled him to be alone with [the child], to have unfettered access to her bedroom, and to conceal, at least for a short time, his criminal conduct." Id. at 911; accord Samuels, 594 So. 2d at 574 (finding that sexual abuse was within the scope of employment when a nursing assistant's tortious conduct was "closely connected to his employment duties so that the risk of harm faced by the young female victim was fairly attributable to his employer, who placed the employee in his capacity as a nurse's assistant and in a position of authority and contact with the victim").

43

Yet foreseeability-centric formulations may be prone to inconsistent and unpredictable outcomes. In John R. v. Oakland Unified School District, for example, the Supreme Court of California declined to impose vicarious liability on a public school after a teacher molested a student whom he invited to his home to participate in an officially sanctioned extracurricular program. 769 P.2d 948, 949 (Cal. 1989). The plaintiff specifically asserted that the teacher used his authority to induce the student to participate in the school-approved work experience program, thereby securing the student's presence at the teacher's home. Ibid. The teacher had "told [the student] that sexual conduct was part of a teacher-student relationship and was intended to help [the student] with his problems." Id. at 955.

Ultimately, however, the Supreme Court of California concluded that "the connection between the authority conferred on teachers to carry out their instructional duties and the abuse of that authority to indulge in personal, sexual misconduct [was] simply too attenuated to deem a sexual assault as falling within the range of risks allocable to a teacher's employer." Id. at 956. The court conceded that teacher-student sexual misconduct "is conceivable, but that is a far cry from foreseeability, even under the broad meaning that concept is given in the respondeat superior context." Id. at 955 n.9. The dissent, in contrast, would have found the school vicariously liable because the

44

abuse occurred during "an officially sanctioned instructional work experience program," the abusive acts "took place solely because of the existence of the relationship of teacher and pupil," and "the teacher, by virtue of the exercise of his official authority, was able to perpetrate the sexual assault." Id. at 454-55 (Mosk, J., concurring in part and dissenting in part).

A standard rooted solely in foreseeability may thus be too elastic: When "fairness" serves as both the basis and the guardrail for imposing vicarious liability, inconsistency in results should be unsurprising.

3.

Beyond the "purpose-to-serve" and "foreseeability" frameworks that courts have relied on, the "scope of employment" analysis has been considered from alternative perspectives.

In The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines, for example, Professor Alan O. Sykes reflected on the "scope of employment" inquiry through the lens of economic efficiency. 101 Harv. L. Rev. 563, 564 (1988). From this economic perspective, Professor Sykes frames the principal "scope of employment" inquiry as whether the employment relationship materially increases the likelihood that a particular wrong will occur. Id. at 571-72. His approach thus departs from considerations of motivation and foreseeability,

focusing instead on causation. See id. at 572, 589. He proposes the following definition of causation: "An enterprise 'fully causes' the wrong of an employee if the dissolution of the enterprise and subsequent unemployment of the employee would reduce the probability of the wrong to zero." Id. at 572.

In practice, adopting a respondeat superior standard grounded in Professor Sykes' risk-based perspective would undoubtedly broaden vicarious liability claims for sexual abuse. In addition, there are no shortage of proposed definitions and areas of improvement for the "scope of employment" doctrine within scholarship that would explicitly broaden liability in the sexual abuse context. See, e.g., Rochelle Rubin Weber, "Scope of Employment" Redefined: Holding Employers Vicariously Liable for Sexual Assaults Committed by their Employees, 76 Minn. L. Rev. 1513, 1539 (1992) ("Courts should adopt a definition of 'scope of employment' that includes torts committed as a result of and during the exercise of job-created power or authority.").

Those evolving standards are not confined to academic debate. The unworkability of traditional approaches to respondeat superior has prompted courts in other common law jurisdictions to rethink their existing approaches. See Martha Chamallas, Vicarious Liability in Torts: The Sex Exception, 48 Val. U.L. Rev. 133, 179 (2013).

46

For instance, Canada's highest court in <u>Bazley v. Curry</u> departed from its former vicarious liability "<u>Salmond</u>" test -- similar to U.S. jurisdictions' "purpose-to-serve" standard -- and adopted a new "enterprise risk" model for vicarious liability.  [1999] 2 S.C.R. 534, para. 46 (Can. B.C.).  The issue in <u>Bazley</u> was whether a non-profit organization operating homes for emotionally disturbed children could be held vicariously liable after an employee abused his position to sexually exploit a vulnerable child.  <u>Id.</u> at paras. 3, 9.

After surveying traditional respondeat superior theories, principles of foreseeability, fairness and deterrence, and drawing on Professor Sykes' scholarship, the Supreme Court of Canada adopted an approach whereby liability attaches when the enterprise creates or materially enhances the risk of the wrongful act, even if the risk had nothing to do with the employer's wishes.  <u>Id.</u> at paras. 38, 41.  It set out five relevant considerations for determining whether vicarious liability should attach to an intentional tort:  (1) the opportunity afforded to the employee to abuse their authority; (2) the extent to which wrongdoing furthered the employer's aims, which would make the wrongdoing more likely to be committed; (3) whether "the wrongful act was related to friction, confrontation, or intimacy inherent" in the job; (4) the degree of authority over the victim conveyed to the employee; and (5) "the vulnerability of potential victims" to the employee's abuse of that authority.

Id. at para. 41. The Court emphasized that those are general, holistic considerations that should not be applied mechanically. Id. at paras. 45-46.

On the facts before it, the Court in Bazley found the relationship between employee and child -- marked by extended solitude, authority, and vulnerability -- was not a mere accident of circumstance but a product of the employer's enterprise, thereby justifying the imposition of liability. Id. at para. 58. Under the Supreme Court of Canada's standard, a quasi-parental relationship of power and trust appears to remain the touchstone for vicarious liability. See Jacobi v. Griffiths, [1999] 2 S.C.R. 570, paras. 3, 29, 83 (Can. B.C.) (applying the same test but declining to impose vicarious liability on a boys' and girls' club in the absence of a quasi-parental relationship between the club's employees and the attending children).

The United Kingdom's highest court followed suit in Lister v. Helsey Hall Ltd., where the Appellate Committee of the House of Lords[8] reversed a prior decision which had found that a headmaster's sexual abuse of a child on a field trip was not within the scope of his employment. [2001] UKHL 22

---

[8] The Appellate Committee of the House of Lords was the court of last resort for most instances of law in the United Kingdom until October 2009 when the U.K. Supreme Court was established. See generally Graeme Cowie & David Torrance, The UK Supreme Court, House of Commons Library (Oct. 1, 2024), accessible at https://researchbriefings.files.parliament.uk/documents/CBP-9536/CBP-9536.pdf.

(HL) 422, 435 (appeal taken from Eng.). Lord Steyn, making the leading judgment, explained that he had "been greatly assisted by the luminous and illuminating judgments of the Canadian Supreme Court in <u>Bazley v. Curry</u> and <u>Jacobi v. Griffiths</u>. Wherever such problems are considered in future in the common law world these judgments will be the starting point." <u>Ibid.</u> (citations omitted). As with the Supreme Court of Canada, Lord Steyn rejected the rigidity of the "<u>Salmond</u>" (i.e., its vicarious liability) test:

> If one mechanically applies <u>Salmond</u>'s test, the result might at first glance be thought to be that a bank is not liable to a customer where a bank employee defrauds a customer by giving him only half the foreign exchange which he paid for, the employee pocketing the difference. A preoccupation with conceptualistic reasoning may lead to the absurd conclusion that there can only be vicarious liability if the bank carries on business in defrauding its customers. Ideas divorced from reality have never held much attraction for judges steeped in the tradition that their task is to deliver principled but practical justice.
>
> [<u>Id.</u> at 429.]

In adopting the Canadian approach, Lord Steyn reasoned that the inquiry should focus on the "nature of employment," specifically, whether "the employer undertook to care for the boys through the services of the warden and [whether] there [was] a very close connection between the torts of the warden and his employment." <u>Ibid.</u> Applying this inquiry to the case before it, the House of Lords determined that vicarious liability applied. <u>Id.</u> at 436.

49

Turning to developments within the United States, the ALI's recently adopted "Special Rule on Vicarious Liability for Sexual Assault" represents the closest analog to the vicarious liability approaches taken by other common law jurisdictions. It is this new formulation, flagged by plaintiff Hornor's counsel, that prompted my exploration of the "scope of employment" issue.

The Third Restatement of Torts retains its "purpose-to-serve" requirement for acts to be within the scope of employment. See Restatement (Third) of Torts § 5(b) (Am. L. Inst., Tentative Draft No. 4, 2025). The ALI's new special rule functions as an exception that would nonetheless permit the imposition of vicarious liability on an employer for its employee's sexual assault of a victim if:

> (a) the nature or conditions of the employee's employment creates a reasonably foreseeable risk of sexual assault;
>
> (b) the victim is particularly vulnerable, by reason of age, mental capacity, disability, incarceration, detention, confinement, medical need, or other similar circumstance;
>
> (c) the employer facilitates the sexual assault by providing the employee with substantial power, authority, or influence over the victim; and
>
> (d) the sexual assault occurs when the employee is performing work assigned by the employer or engaging in a course of conduct subject to the employer's control.

[<u>Id.</u> § 11.]

This approach seeks to integrate concepts of foreseeability, uniquely at-risk victims, and employer-authorized power over victims, all of which have animated courts' expansion of vicarious liability discussed above.

But this rule is not applicable here for several reasons:  For one, this Court has not adopted the Restatement (Third) of Torts.  Further, broad adoption of this new rule would amount to a significant departure from existing vicarious liability principles, extending liability well beyond the confines of the employment relationship presented in the matter before us.  And most importantly, the Restatement (Third)'s new rule functions as a "special rule" to <u>vicarious liability</u>, unbounded from that of the traditional "scope of employment" limiting principle.  Indeed, the ALI has maintained its "purpose-to-serve" requirement for respondeat superior, <u>see</u> <u>id.</u> § 5, instead preferring to expand vicarious liability by way of a context-dependent <u>exception</u> to its rule, rather than allowing for context-dependent constructions of "scope of employment" in the first place.  As discussed at length above, any judicial expansion of <u>public entity</u> vicarious liability for employee acts <u>outside</u> the scope of employment remains barred by operation of the Tort Claims Act.

B.

To delineate the appropriate limitations on imposing vicarious liability, it is necessary to first examine the underlying justifications that animate the doctrine of respondeat superior. Indeed, reflecting on those rationales is of principal importance to properly articulating a "scope of employment" standard for a given context in the first place. See John R., 769 P.2d at 955 (anchoring its "scope of employment" inquiry in the "underlying rationale" behind respondeat superior, rather than a mechanical re-application of precedent).

Exploring the rationale behind respondeat superior requires reflection on two principal goals that undergird our tort jurisprudence: corrective justice, often described as a "fairness" justification, which treats tort law as a mechanism to vindicate the individual moral rights between the parties; and deterrence, often termed an "economic" justification, which regards liability as an economic instrument that incentivizes proper conduct and deters harmful conduct. See Gary T. Schwartz, Mixed Theories of Tort Law: Affirming Both Deterrence and Corrective Justice, 75 Tex. L. Rev. 1801, 1801-11 (1997). From a corrective justice perspective, imposition of respondeat superior is warranted because an employee who acts within the scope of employment functions as an extension of the employer, such that "the employer can, in

some sense, be regarded as the doer of the harm." Ernest J. Weinrib, The Idea of Private Law 185-87 (1995); see also Ira S. Bushey & Sons, Inc., 398 F.2d at 171 (explaining that respondeat superior "rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities").

From a deterrence perspective, imposition of respondeat superior is warranted because an employer is "better able to absorb [costs], and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large." Prosser on Torts § 69. A prophylactic rule of vicarious liability then incentivizes employers to adopt reasonable measures to avoid future harm. See ibid.; see also Sykes, 101 Harv. L. Rev. at 564; William M. Landes & Richard A. Posner, The Positive Economic Theory of Tort Law, 15 Ga. L. Rev. 851, 914-15 (1981) (discussing respondeat superior as an incentive for employers to exert their control over employees in a manner that induces careful, non-tortious conduct).

Thus, as with any principle of tort law, application of respondeat superior must effectuate the twin jurisprudential aims underlying this body of law: justly vindicating the parties' rights and efficiently deterring future tortious conduct.

In practice, this Court has focused on deterrence to justify application of respondeat superior. In <u>Galvao v. G.R. Robert Construction Co.</u>, the Court addressed the scope of vicarious liability under the doctrine of respondeat superior. 179 N.J. 462, 467-68 (2004). To do so, the Court identified two bases for how respondeat superior effectuates deterrence: a traditional "control" rationale, and a more modern "risk-allocation" rationale. <u>See</u> <u>ibid.</u> The Court explained that, under the traditional "control" rationale, "[t]he employer, having 'set the whole thing in motion,' should be held 'responsible for what happened.'" <u>Id.</u> at 467 (quoting <u>Prosser on Torts</u> § 69).

> Thus, if control over the employee is demonstrated, vicarious liability should attach for an employer because the tort common law interest in deterrence would be furthered: liability would be imposed on the party that is responsible for choosing task methodologies and that is able to alter such task methodologies if they prove injurious.
>
> [<u>Ibid.</u>]

The Court then explained that, under the modern "risk-allocation" rationale, imposition of respondeat superior is the best tool to incentivize employers to mitigate hazards. <u>Id.</u> at 468. The Court expressed the same in <u>Eule v. Eule Motor Sales</u>, where it stated that a modern justification for imposing "vicarious liability is one of policy. . . . The losses caused by torts for the servant which are more or less certain to occur in the conduct of the master's

54

enterprise, and are closely connected with it, are placed upon the employer because he is better able to bear them." 34 N.J. 537, 544 (1961) (quoting Prosser on Torts § 62 (2d ed. 1955)).

C.

Finally, it must be reiterated that all "scope of employment" standards outlined above fundamentally and necessarily "turn[] on the parameters of the employment relationship." Davis, 209 N.J. at 288. This variability in meaning and application flows directly from differences in the nature of the employment context, a point of particular importance here, given that the relationship between school and teacher is materially distinct from that of the traditional commercial employer-employee setting.

It is well settled that schools and teachers stand in loco parentis and therefore "tak[e] on all or some of the responsibilities of a parent." Hardwicke, 188 N.J. at 91. A child's participation in this relationship is not voluntary, it is mandated: "The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours." Frugis v. Bracigliano, 177 N.J. 250, 268 (2003). Thus, "[w]hile their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards." Ibid. Critically, to effectuate this guardianship, schools

55

must endow teachers with legal access to -- and control over -- children, access and control they derive solely from their employment relationship and possess only within its confines.

To be sure, for purposes of respondeat superior, it is the scope of the school-teacher relationship at issue, not solely the existence of a teacher-student relationship. See Davis, 209 N.J. at 288. But the nature of the school-teacher relationship, and the consequences that flow from it, become inexorably linked to the teacher-student relationship when the school itself creates, structures, and governs that relationship, to its own benefit.

Consistent with this notion, we have long recognized the "unique role" that educators play in the care and well-being of students and the "great[] obligation" placed on schools as, ultimately, guardians that must protect children from harm. Hardwicke, 188 N.J. at 92; Frugis, 177 N.J. at 268. The school's obligation is so great because students are inherently vulnerable due to their youth, developing cognitive capacity, expectation of obedience to school authority, and dependence upon school personnel for supervision and guidance. See Frugis, 177 N.J. at 268; Jerkins ex rel. Jerkins v. Anderson, 191 N.J. 285, 295 (2007). Indeed, the "unique role" of school officials encompasses duties far beyond the mere delivery of educational instruction. As this Court has recognized, teachers bear not only "the responsibility to

56

maintain, rear, and educate," but also "the duties of supervision, care, and rehabilitation" -- obligations that inherently require teachers to pursue a close, nurturing relationship with students, and which could never be wholly confined to a mere list of discrete tasks. Hardwicke, 188 N.J. at 91 (quoting Dale v. Boy Scouts of Am., 160 N.J. 562, 602 (1999), rev'd on other grounds, 53 U.S. 640 (2000)). The school-teacher employment relationship is therefore unique because it necessarily entails a teacher-student relationship -- one that compels a teacher to go beyond the mere impartation of academic knowledge to actively engaging in the close, authoritative interactions that shape and define the school environment.

## III.

Upon this comprehensive review, I would hold that a public school employee's willful, wanton, or grossly negligent sexual acts fall within the scope of their employment if: (1) the employee possessed an official, entity-granted in loco parentis relationship to the victim, by which they were given authority and control over the victim; and (2) the employee engaged in the tortious acts during the exercise of that authority in performing entity-assigned duties, or otherwise engaging in a course of conduct subject to the entity's control.

This holding synthesizes and extrapolates core principles and conclusions drawn from the outline above. First, any attempt at a narrow, universal test for "scope of employment" fails to acknowledge the variance of employment relationships in vastly different employment contexts. Rather than perfunctorily apply a universal respondeat superior definition that would frustrate fairness and deterrence, or adopt multi-factor exceptions to the general rule for respondeat superior, a unique, context-dependent definition of respondeat superior itself is warranted here. That is because of the particular employer-employee relationship at issue. Courts applying respondeat superior -- whether implicitly or explicitly -- have long recognized the materially distinct nature of an employment relationship where that relationship centers on the employer conferring upon the employee substantial authority, access, and control over a vulnerable victim.

Second, for that reason, this holding would apply only where the nature of the employment relationship itself involves a particularly vulnerable relationship -- one where the employer requires the employee to assume an in loco parentis relationship over the victim. Because liability would attach only when the public school district has granted the employee authority and access over the child, it could be said that the employer "caused" the harm in the sense that the in loco parentis relationship materially generated or elevated the

risk of abuse.  See Bazley, 2 S.C.R. at paras. 38, 41.  This is of course distinct

from negligence-based causation; it instead speaks to the employer's role in

creating the conditions for harm.  See ibid.  This "causal" rationale draws from

risk-based theories, wherein application of respondeat superior is understood

to apply when the employer in some way "caused" the harm, so that imposition

of liability would deter tortious harms the employer created or materially

enhanced.

Third, this holding's requirement that the tortious conduct occur during

the exercise of entity-assigned authority limits liability to the period of time

that the employer retains control over the employee's authorized conduct,

anchoring it in traditional respondeat superior principles.  See Riviello v.

Waldron, 391 N.E.2d 1278, 1281 (N.Y. 1979) (explaining that New York's

"scope of employment" test "has come to be 'whether the act was done while

the servant was doing his master's work, no matter how irregularly, or with

what disregard of instructions'" (emphasis added) (quoting Baker v. Allen &

Arnink Auto Renting Co., 131 N.E. 551, 552 (N.Y. 1921))).  In doing so, this

holding represents a middle-ground in breadth between the restrictive

"purpose-to-serve" standard and a broader foreseeability-based analysis.  This

articulation of "scope of employment" borrows from Bushey and the

foreseeability-based jurisdictions the notion that "motive is not a

59

consideration," because there is no reason to adopt such a doctrinaire approach in this context. But it also rejects foreseeability as the sole criterion for liability. It does so in the name of consistency and more defined boundaries so as to better allow school districts to predict the parameters of potential liability, thereby incentivizing them to deter tortious conduct. To that end, it should be noted that school-authorized and controlled authority is not necessarily limited to the geographic limits of the school and the temporal limits of the school day. See Jerkins ex rel. Jerkins, 191 N.J. at 289 (a school's in loco parentis authority over the children under its care "does not summarily disappear when the school bell rings").

As a limiting factor, this holding instead principally incorporates the Restatement (Third) Special Rule's emphasis on employer control over the employee, a principle foundational to application of respondeat superior. The limitation to tortious conduct temporally and causally connected with the employee's engagement in acts subject to the employer's control best effectuates the twin aims of our tort jurisprudence: fairness and deterrence. Those general aims serve as the start and the end of any inquiry into the application of respondeat superior. See John R., 769 P.2d at 955; Galvao, 179 N.J. at 467-68. As to fairness, requiring that the sexual misconduct occur during the employee's exercise of authority granted by the employer ensures a

60

sufficient causal connection to justify liability, since it is fair to say that the employee, in exploiting that employer-granted authority, acts "through" the entity. See Weinrib, 185-87. And as to deterrence, this holding matches both deterrence-based rationales this Court identified in Galvao. 179 N.J. at 467-68. First, because this holding would only impose liability "if control over the employee is demonstrated," it focuses liability on parties best positioned to prevent future harm by preserving the capacity and incentive for entities to refine their supervisory methods. Id. at 467 (emphasis added). And second, by allocating the cost of liability to the entity, victims are more likely to be compensated, and entities are incentivized to mitigate future harm so as to "defray the costs of . . . liability." Id. at 468.

To illustrate the outer bounds of this holding in practice, let us consider for a moment its application to facts similar to that of John R., 769 P.2d at 949-51, discussed above: A student is sexually abused by their high school teacher while at the teacher's apartment to participate in a school-sanctioned, extracurricular program. By way of employment, the teacher was authorized to invite students participating in the program to their home, a program which the teacher was tasked with fulfilling, and which was thus under the district's control. The teacher had encouraged the student to come to the teacher's home to participate in the program, an option authorized by the school district.

61

Under the standard articulated here, a school district could be vicariously liable because the abuse stemmed directly from the teacher's in loco parentis authority -- granted by virtue of the employment relationship -- and occurred during the effectuation of that authority in a program assigned or otherwise authorized by the district itself, and therefore subject to the district's control. Accordingly, the abuse would fall within the scope of employment, and vicarious liability would attach to a public school district.

## IV.

Application of my holding to the allegations in the complaints before us is straightforward. I would affirm the order dismissing the complaint under Rule 4:6-2(e) in Hornor but reverse the order dismissing the complaint under Rule 4:6-2(e) in Simpkins for the following reasons.

## A.

In both Hornor and Simpkins, the TCA controls plaintiffs' vicarious liability claims against the school districts. Prior to the 2019 amendment, N.J.S.A. 59:2-10 -- a TCA-granted immunity that spares public entities from liability when their employees' misconduct was willful or criminal -- would have shielded the districts from liability. Following the 2019 amendment, however, N.J.S.A. 59:2-1.3(a) retroactively disables TCA-granted immunities for such sexual acts. Therefore, even though the alleged conduct here resulted

62

from willful, wanton, or grossly negligent sexual acts, the TCA does not categorically bar plaintiffs' claims.

Because N.J.S.A. 59:2-1.3(a) does not disable the TCA's "scope of employment" limitation on public entity vicarious liability, however, in order to hold the school districts vicariously liable for the teachers' sexual misconduct, plaintiffs must still allege that those teachers engaged in the willful, wanton, or grossly negligent sexual acts within the scope of their employment with the school districts. See N.J.S.A. 59:2-2(a).

## B.

I must next consider whether the plaintiff in Hornor and plaintiffs in Simpkins adequately pled facts that support holding the school districts vicariously liable for the teachers' sexually abusive acts.

## 1.

First, as to Hornor's complaint, Hornor does not allege acts that suggest that defendant Hutler's abuse was within the scope of his employment with the school district.[9] Hutler, as Hornor's science teacher and advisor, did possess an entity-granted in loco parentis relationship over Hornor, a then-fifteen-year-

---

[9] I acknowledge that Hornor conceded the sexual abuse was outside the scope of Hutler's employment. In light of this holding's "scope of employment" articulation, however, and given the procedural posture, I nonetheless consider whether the facts as pled might support a contrary conclusion.

63

old high school student.  But Hornor does not allege that Hutler sexually molested him during the exercise of that authority in a course of conduct subject to the district's control.  Rather, the abuse occurred at Hutler's apartment after he took Hornor and his friends to a movie theater and a liquor store, which itself occurred after the completion of a Future Farmers of America contest.  Even granting plaintiff Hornor every reasonable inference of fact from his complaint, Hornor does not allege that the district authorized the celebratory trip to the movie theater or the subsequent stop at Hutler's apartment, or otherwise empowered Hutler to escort Hornor to interscholastic activities off of school property.  Therefore, he fails to allege that Hutler's acts were taken during a course of conduct within the district's control over Hutler's school-granted authority over him.

Accordingly, I would affirm the Appellate Division's reversal of the order that denied the Board's motion to dismiss the counts of Hornor's complaint asserting claims for vicarious liability.

2.

Second, as to the complaints filed by Simpkins, Jerome, and Hayes, those plaintiffs allege acts that suggest defendant Dufault's sexual abuse occurred within the scope of her employment.  As a language arts and special education high school teacher, Dufault was placed by the school district in an

in loco parentis relationship of authority and control over the three students. Simpkins alleges Dufault exercised that authority in regularly abusing him "during their special needs morning class" -- a course of conduct during school hours, on school grounds, and subject to the district's control. Similarly, Jerome alleges Dufault abused him during lunch hours, and Hayes alleges Dufault's abuse occurred during Dufault's summer-school teacher duties.

Accordingly, for substantially different reasons than the majority, I would reverse the order that granted the school district's motion to dismiss plaintiffs' complaints, and allow the Simpkins plaintiffs to proceed on their vicarious liability claims.

For the foregoing reasons, I dissent.